**WINDHAM SOLID WASTE MANAGEMENT DISTRICT, Plaintiff–Appellant,**

v.

**NATIONAL CASUALTY COMPANY, Defendant–Appellee.**

**No. 97–9536.**

United States Court of Appeals, Second Circuit.

Argued May 12, 1998.

Decided June 22, 1998.

John J. Boylan, III, Boylan & Bowen, Springfield, VT, for Plaintiff–Appellant.

Shapleigh Smith, Jr., Dinse, Knapp & McAndrew, Burlington, VT (Samuel Hoar, Jr., of counsel), for Defendant–Appellee.

Laura A. Foggan, Wiley, Rein & Fielding, Washington, DC (Daniel E. Troy, of counsel), for Amicus Curiae Insurance Environmental Litigation Association.

Before: WINTER, Chief Judge, McLAUGHLIN, Circuit Judge, and SHADUR,* District Judge.

* The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.

WINTER, Chief Judge:

The Windham Solid Waste Management District ("the District") appeals from an adverse grant of summary judgment and dismissal of its declaratory judgment action against its insurance carrier, National Casualty Company ("National"). The District is an entity controlled by various Vermont municipal or local governments that use it for purposes of waste disposal. The District has incurred remediation costs because of its failure to comply with the terms of a Provisional Certification issued by the Vermont Agency of Natural Resources ("ANR"). The District claims that National must indemnify it for those costs because they were the result of a "claim" made during the term of a liability insurance policy issued by National. Chief Judge Murtha held that the "claim" for which the District seeks indemnification was made before the liability insurance policy went into effect.

We note initially that this is a case in which Vermont governmental units have caused the District to invoke federal diversity jurisdiction in order to bring a claim governed by Vermont law against an out-of-state insurance company. Although flattered by the District's evident preference for a decision by a federal court, we do note that a better example of the overbreadth of the current definition of diversity jurisdiction would be difficult to find. Fortunately, the issue posed is not difficult, and we affirm.

The pertinent facts are not in dispute. In 1989, the District began operating an unlined solid-waste facility in Brattleboro, Vermont. In 1991, the ANR issued the District a Provisional Certification enabling it to service the Town of Bennington from its Brattleboro site. One of the conditions of the Provisional Certification was that the District maintain a 20-foot buffer zone between the bottom layer of solid waste deposited in the "pit area" of the landfill and the top of a layer of bedrock located beneath the pit area.

In connection with its operation of the Brattleboro facility, the District secured a Public Officials Liability Policy ("the Policy") issued by National. The Policy went into effect on January 1, 1994, and covered "all sums which the INSURED shall become legally obligated to pay as damages as a result of claims first made during the period of this policy, against the INSURED by reason of WRONGFUL ACT(s)...."

On October 6 and 7, 1993, nearly three months before the Policy went into effect, the ANR evaluated the Brattleboro facility and discovered several alleged violations of the Provisional Certification. On November 8, 1993, Bryan Harrington of the ANR's Solid Waste Management Division wrote to the District and explained that it was his "understanding that municipal solid waste was placed directly on bedrock...." Harrington also stated that, "[a]s agreed, all waste within 20 feet of bedrock will be excavated."

On November 17, 1993, Edward Leonard, the Director of the ANR's Solid Waste Management Division, sent the District a Notice of Alleged Violation ("NOAV"). The NOAV outlined the various alleged violations and directed the District to respond in writing to the allegations. The failure to maintain a 20-foot buffer zone was not listed as one of the alleged violations.

On December 8, 1993, however, the District excavated numerous test borings to determine the extent of separation between the solid waste and the layer of bedrock and discovered that there were several violations. On December 22, 1993, the District outlined in writing a "proposed exploratory drilling program," in which the District would take several test borings from various points throughout the facility to ascertain the full extent of the buffer-zone infractions. On December 27, 1993, Harrington approved in large part the District's proposed program, noting that the program "is in response to the [ANR's] requirement that the District investigate the extent of the two serious violations which have occurred in the pit area," one of which being "the placement of refuse within twenty feet of bedrock." The ANR further requested that the District take additional test borings throughout other portions of the landfill "to determine if past landfill operations could have potentially placed refuse over bedrock." The ANR, however, had not yet "determined whether the District will be responsible for all refuse historically

placed over bedrock, or limited to refuse placed under the District's control of the landfill."

In January and February 1994, the District took and examined the test borings in accordance with the approved drilling program and discovered several additional violations. In March 1994, the ANR mailed to the District a proposed "Assurance of Discontinuance" ("AOD"), which, under Vermont law, is essentially a settlement agreement that, when signed by both parties and the state environmental court, becomes a judicial order. *See* Vt. Stat. Ann. tit. 10, § 8007. The proposed AOD provided, *inter alia*, that the District had "violated the terms of the Provisional Certification ... in failing to maintain the required twenty feet of separation between the bottom of solid waste disposed of in the landfill and the top of the bedrock layer underlying the landfill." In the section labelled "Agreement," the District was, *inter alia*, to pay a penalty of $140,000, to "immediately cease the placement of any waste" in areas that violated the 20–foot–buffer–zone requirement, and to complete, by July 1, 1994, "remediation of all areas of the pit where [the District] has placed waste within twenty feet of bedrock."

On April 12, 1994, counsel for the District sent a letter to National purporting to "assert a claim" under the Policy. The letter stated that the "claim results from the attached Notice of Alleged Violation," and that the "District is also in receipt of a proposed Assurance of Discontinuance ..., which is the subject of currently on-going negotiations." On April 28, 1994, National announced that it would refuse to defend or indemnify the District, arguing that the "claim" against the District was asserted before the effective date of the Policy and that the claim sought relief specifically excluded from coverage.

The District and the ANR continued to negotiate the terms of the AOD, finally agreeing to the following terms: the District would pay a fine of $75,000, would immediately cease placing any waste in areas that violated the 20–foot buffer-zone requirement, and would complete, by September 1, 1994,

remediation of all such areas. On June 20, 1994, the District signed the amended AOD.

On December 12, 1994, counsel for the District wrote to National, again seeking indemnification under the Policy. That request was denied once more. This suit followed, with the District seeking a declaratory judgment that National breached the terms of the Policy by refusing to indemnify and reimburse the District for the costs the District incurred as a result of its violation of the Provisional Certificate's buffer-zone requirement. Chief Judge Murtha granted National's motion for summary judgment, determining, *inter alia*, that ANR's "claim" against the District was as a matter of law "first made" before January 1, 1994, the date on which the Policy went into effect.

We review *de novo* the district court's decision to grant summary judgment. Because the insurance policy at issue is a "claims made," rather than an "occurrence," policy, the District is protected only against claims made during the life of the Policy. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). We need address, therefore, one fairly straightforward question: whether, under the terms of the Policy, a "claim" was "first made" against the District before January 1, 1994.

Under Vermont law, an "insurance policy must be interpreted according to its terms and the evident intent of the parties as expressed in the policy language."[1] *Cooperative Fire Ins. Ass'n v. Bizon*, 166 Vt. 326, 693 A.2d 722, 727 (1997). Language in the terms of a policy should be read according to its plain, ordinary, and popular meaning. *See Northern Sec. Ins. Co. v. Hatch*, 165 Vt. 383, 683 A.2d 392, 394 (1996). Any ambiguity must be construed in favor of the insured, but the insurer "should not be deprived of unambiguous provisions put into a policy for its benefit." *Id.*

We have found no cases in which the Vermont Supreme Court has defined the term "claim." Caselaw elsewhere indicates that the plain and ordinary meaning of "claim" is

---

**1.** The District asserts, and National does not dispute, that Vermont law applies here.

"a demand for specific relief owed because of alleged wrongdoing." *In re Ambassador Group, Inc. Litig.*, 830 F.Supp. 147, 155 (E.D.N.Y.1993). *Accord Home Ins. Co. v. Spectrum Info. Techs., Inc.*, 930 F.Supp. 825, 846 (E.D.N.Y.1996) ("Courts have found that the term 'claim' as used in liability insurance policies is unambiguous and generally means a demand by a third party against the insured for money damages or other relief owed."); *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1374 (D.N.J.1992) ("[A] claim is a '[d]emand for money or property as of right.'") (quoting Black's Law Dictionary 247 (6th ed.1990)); *Insurance Corp. of Am. v. Dillon, Hardamon & Cohen*, 725 F.Supp. 1461, 1469 (N.D.Ind.1988) (claim is "a demand for money or property or some specific relief, accompanied by an allegation of negligence, malpractice, or some kind of wrongdoing"); *City of Marion v. National Cas. Co.*, 431 N.W.2d 370, 373 (Iowa 1988) (claim is "'assertion, demand or challenge of something as a right'") (quoting *Williamson & Vollmer Eng'g, Inc. v. Sequoia Ins. Co.*, 64 Cal.App.3d 261, 134 Cal.Rptr. 427, 431 (1976)); *Central Ill. Pub. Serv. Co. v. American Empire Surplus Lines Ins. Co.*, 267 Ill. App.3d 1043, 204 Ill.Dec. 822, 642 N.E.2d 723, 725 (1994) (claim is "'a demand for something due or believed to be due'") (quoting Webster's Fifth New Collegiate Dictionary 205); *Phoenix Ins. Co. v. Sukut Constr. Co.*, 136 Cal.App.3d 673, 186 Cal.Rptr. 513, 515 (1982) (claim "is a demand for something as a right, or as due"); *see also MGIC Indem. Corp. v. Home State Sav. Ass'n*, 797 F.2d 285, 288 (6th Cir.1986) (interpreting term "claims made against [insured] for Wrongful Acts" as "speaking not of a claim that wrongdoing occurred, but a claim for some discrete amount of money owed to the claimant on account of the alleged wrongdoing").

■ A claim may be something other than a formal lawsuit, especially where, as here, the insurance policy treats "claims" and "suits" as separate terms. *See Home Ins. Co.*, 930 F.Supp. at 846; *In re Ambassador Group*, 830 F.Supp. at 154–55; *Dillon, Hardamon & Cohen*, 725 F.Supp. at 1469. However, an accusation that wrongdoing occurred is not by itself a claim, *MGIC Indem. Corp.*,

797 F.2d at 288; *In re Ambassador Group*, 830 F.Supp. at 155; *Dillon, Hardamon & Cohen*, 725 F.Supp. at 1472; nor is a naked threat of a future lawsuit, *In re Ambassador Group*, 830 F.Supp. at 155; *Hatco Corp.*, 801 F.Supp. at 1374; or a request for information or an explanation, *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864, 866 (9th Cir. 1979); *Dillon, Hardamon & Cohen*, 725 F.Supp. at 1469. A claim requires, in short, a specific demand for relief.

■ There is certainly nothing in the Policy suggesting that the caselaw described above does not apply. While the Policy contains no formal definition of the term "claim," it does state in a sub-section entitled "Notice Of Claim" that the District must notify National whenever it receives "written or oral notice from any party that it is the intention of such party to hold [the District] responsible for any Wrongful Act(s)."

Given the caselaw and the Policy's language, we believe it obvious that the ANR's claim against the District was made as a matter of law before January 1, 1994. On November 8, 1993, the ANR informed the District that "municipal solid waste was placed directly on bedrock," an allegation that the District confirmed on December 8. The November 8 letter further provided that, "[a]s agreed, all waste within 20 feet of bedrock will be excavated" and "[a]t least 20 feet of earthen material shall be placed over the bedrock." The ANR's letter of December 27, 1993, continued along the same lines, accusing the District of "two serious violations" of the Provisional Certificate, one of which being "the placement of refuse within twenty feet of bedrock," and made clear that the District "will be responsible for ... refuse placed under the District's control of the landfill." The only reservation expressed in this demand for relief concerned the fact that some of the refuse placed on bedrock might have been put there before the District exercised control over the area. The correspondence from the ANR easily constituted a "written ... notice from [the ANR] that it [was] the intention of [the ANR] to hold the District responsible for [remediation of waste within 20 feet of bedrock]" as required by

sub-section 9 of the Policy. The November 8 and December 27 letters constituted an allegation of wrongdoing coupled with a demand for specific relief—namely, excavation of all waste placed within 20 feet of bedrock and compliance with the buffer-zone requirement. It was the cost of such compliance for which the District sought indemnification from National.[2] *See* Appellant's Reply Br. at 1 ("The District's claim is for those costs it incurred as a result of having to dig up and remove solid waste").

■ Although not disputing these facts, the District maintains that the ANR's letters do not amount to a "claim" because the letters did not amount to an "enforcement action." We disagree. A claim under the terms of the policy can be some demand well short of a formal enforcement proceeding. Indeed, again as noted above, the sub-section of the policy entitled "NOTICE OF CLAIM" states that the District is bound to notify National whenever it receives "written or oral notice from any party that it is the intention of such party to hold [the District] responsible for any WRONGFUL ACT(s)." This language clearly contemplates that something considerably less than the initiation of a formal enforcement proceeding can be a claim. *See, e.g., Phoenix Ins. Co.,* 186 Cal. Rptr. at 515 (oral demand of attorney to work for free to cure problems created by part wrongdoing constituted claim).

The District next argues that, because the full extent of the District's violations and thus the extent of the required cleanup were not known before 1994, the letters amounted to only a "threat of a claim." We again disagree. This is not a situation where a third party, not yet damaged, tells the insured merely that it " 'would be held liable

for any possible future damages flowing from' " the insured's wrongful act. *Hatco Corp.,* 801 F.Supp. at 1374 (holding that such a statement was a mere threat of a claim) (quoting *Evanston Ins. Co. v. Security Assurance Co.,* 715 F.Supp. 1405, 1413 (N.D.Ill. 1989)) (emphasis omitted). Here, the District was told in substance in 1993 that it was responsible for the cost of remediation, whatever that cost would prove to be. Thus, the issue as of January 1, 1994, was not whether there would be any relief sought in the future, but rather how much the relief sought now would ultimately cost the District.

The fact that, as of January 1, 1994, the full amount of the cost of remediation was not known does not undermine our conclusion. Under the District's theory, a claim cannot be asserted until the full extent of the harm is known. Even in the context of formal litigation, however, the total of damages is often not known when a complaint is filed. Such an interpretation of the term "claim" is patently unreasonable, and is made even more unreasonable where, as here, the policy at issue is a "claims-made" policy and the insured has control over when the full extent of damage can be ascertained.

Because we agree with Chief Judge Murtha that the ANR's claim against the District was made before the Policy went into effect, we need not reach the issue of whether the costs incurred by the District are excluded from coverage under the Policy. Accordingly, we affirm.

---

2. The District also sought indemnification for a $75,000 fine imposed by the ANR for the District's failure to comply with the buffer-zone requirement. Nothing in the record indicates that the District was aware in 1993 of a possible fine. Even if, *arguendo,* the fine were not part of the "claim" made in 1993 by the ANR, the fine is excluded from coverage under the Policy as a "civil fine, penalty or expense against any IN-SURED arising from any complaint or enforcement action from any federal, state or local governmental regulatory agency." The District's reply brief makes clear that it is no longer "seeking coverage for fines and penalties paid by it." Appellant's Reply Br. at 4.