## TIG Insurance Company *vs.* Lawrence L. Blacker.

No. 99-P-1502.

Suffolk. October 12, 2001. - May 10, 2002.

Present: Greenberg, Doerfer, & Cohen, JJ.

*Insurance,* Liability insurance, Misrepresentation. *Contract,* Rescission. *Practice, Civil,* Summary judgment.

Where an attorney seeking a claims-made professional liability insurance policy responded in the negative to a question on the application relating to potential claims, and thereby denied that he had a "reasonable basis to foresee" that a professional liability claim would be made against him, despite having received notice of potential claims against him, the attorney, whether acting deceitfully or not, misrepresented his situation and thereby increased the insurer's risk of loss; therefore, the insurer was entitled to summary judgment in a civil action seeking a declaration that the insurer could rescind the policy that issued to the attorney. [686-689]

Civil action commenced in the Superior Court Department on January 23, 1998.

The case was heard by *Carol S. Ball,* J., on a motion for summary judgment.

*Paul S. Samson* for the defendant.

*Erik Lund* for the plaintiff.

Cohen, J. At issue in this appeal is whether the defendant's application for professional liability insurance contained misrepresentations that increased the insurer's risk of loss, thereby allowing the insurer to rescind the policy. We conclude that the insurer is entitled to a declaration that it may rescind, and affirm the Superior Court's grant of summary judgment in the insurer's favor.

*Background.* The uncontroverted facts contained in the summary judgment record may be summarized as follows. On October 29, 1996, the defendant, attorney Lawrence L. Blacker, submitted an application to the plaintiff, TIG Insurance

Company (TIG), for a claims-made[1] attorneys' professional liability policy. Blacker sought to replace claims-made coverage that he had purchased for several years from Reliance National Insurance Company (Reliance). His existing coverage, which was due to expire on December 14, 1996, was not as expansive as that offered by TIG, in that the Reliance standard form policy contained an exclusion for claims arising out of acts, errors or omissions involving the attorney's work on securities transactions, whereas no such exclusion was present in the TIG standard policy.

The TIG application required Blacker to answer several pages of questions about his firm, his practice, his risk management procedures, his current insurance, and his claim history. The application asked in Question 28(a), "During the past five years, has any professional liability claim or suit ever been made against any lawyer listed in [the application] or any lawyer while a member of a predecessor firm?" Blacker answered "Yes," disclosing in a Claim Information Supplement that there was only one such claim, that it was settled for $3,500.00, and that it was now closed. The application also inquired, in Question 28(b), "After inquiry, does any lawyer named in [the application] know of any wrongful acts, errors or omissions that could result in a professional liability claim against any past or present attorney of the firm or its predecessors or has [*sic*] a reasonable basis to foresee that a claim would be made against any past or present attorney or the firm or its predecessors, regardless of the validity of such claim?" Blacker responded "No."[2]

For some time before submitting his application to TIG,

---

[1] "A claims-made policy covers the insured for claims made during the policy year and reported within that period or a specified period thereafter regardless of when the covered act or omission occurred." *Chas. T. Main, Inc.* v. *Fireman's Fund Ins. Co.*, 406 Mass. 862, 863-864 (1990).

[2] The application also asked, in Question 20, "Has any attorney in the firm or predecessor firm, at any time in the past five years, served as a director, officer, trustee or partner of, or has exercised any fiduciary control over, any organization other than the law firm?" Blacker answered "No," even though he had served as a corporate officer in seven corporations during the relevant time frame. Because we decide the case based upon Blacker's answer to Question 28(b), we need not address Blacker's contentions that the underwriting consequences of his answer to Question 20 could not be determined on the summary judgment record as matter of law and that, at a minimum, he was entitled to further discovery on this issue.

Blacker had represented a client named Robert D. Gersh. In addition to incorporating several companies controlled by Gersh, Blacker represented Gersh in three securities transactions, involving two of Gersh's companies, in which Gersh sold investors certificates of participation (COPs) in pools of equipment leases entered into by State and local governments. In connection with each of these securities transactions, Blacker issued legal opinions to Gersh and prepared private placement memoranda, declarations of trust, tax opinions, certificates of participation, assignments, and, in one instance, a guaranty agreement. Blacker understood that the private placement memoranda and tax opinions would be circulated to potential investors who would rely on those documents in making their investment decisions.

In November, 1995, the Securities and Exchange Commission (SEC) filed a civil action against Gersh and various of his companies, including several where Blacker served as clerk, alleging that the private placement memoranda for the COPs were misleading in material respects. Specifically, the SEC contended that one of the memoranda contained numerous false statements, and others failed to disclose that the principals involved in the COPs transactions were controlled by Gersh.

By early 1996, Blacker was well aware of the SEC's civil action against Gersh. Indeed, he represented several of the Gersh companies in that litigation. In that context, he learned that the SEC was taking the position that documentation that he, Blacker, had prepared in his capacity as Gersh's attorney did not make adequate disclosures and contained false statements. That his work for Gersh was under scrutiny was further brought home to Blacker in April, 1996, when he received two letters from attorney Gregory Wille of the Milwaukee law firm of Wrenn, Wille & Gregory. Wille represented Robert W. Baird & Co. (Baird), an entity which had purchased over $1 million of securities issued by Gersh. After selling these securities to investors, Baird repurchased them, after default.

The first Wille letter was a three-page, single-spaced explanation of Baird's losses and its interest in obtaining further information from Blacker. The letter informed Blacker that he was a potential target of legal action, stating "[W]e must

consider and evaluate the possibility of a claim against you based on your involvement in the issuances of these COPs." The letter went on to describe Wille's understanding of Blacker's role in issuing an opinion letter upon which Baird had relied and in drafting or approving the placement memoranda. It also noted the significant extent of Blacker's involvement with Gersh. The letter then stated, "We believe the foregoing facts provide sufficient bases on which a lawsuit could be commenced." Nevertheless, Wille extended an invitation for dialogue before "immediately engaging . . . in protracted and expensive litigation." He suggested that Blacker enter into a tolling agreement and asked that he provide information, including "the name, address and telephone number of the insurance carrier(s) through whom you carried professional liability or other applicable insurance coverage." Wille's second letter enclosed a draft of the proposed tolling agreement to be entered into by Baird and Blacker concerning "any claim" that Baird might have against Blacker. Six months later, Blacker applied for his TIG policy without disclosing the Wille correspondence or the SEC proceedings.

On December 31, 1996, seventeen days after his TIG policy went into effect, Blacker received a letter from another law firm, Riemer & Braunstein, as counsel for the receiver of certain Gersh-controlled companies that Blacker had represented. The purpose of the letter was to notify Blacker of the receiver's legal malpractice claims against him. Blacker notified TIG of the Riemer & Braunstein letter, and TIG investigated. During its investigation, TIG learned of the SEC proceedings and also found out about the Wille letters. TIG then notified Blacker of its intention to rescind the policy on the ground that he had made material misrepresentations in his application for the policy, and brought this action seeking a declaration that it was entitled to do so.

*Discussion.* In Massachusetts, the right of an insurer to rescind a policy based upon a misrepresentation in the insured's application for insurance is circumscribed by G. L. c. 175, § 186. This statute provides: "No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or

defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."[3] Thus, for summary judgment to obtain in a case of this nature, the undisputed facts must warrant the conclusion as matter of law that the insured made a misrepresentation, and that it was made either with deceitful intent or, if innocent, increased the insurer's risk of loss.

Here, TIG does not shrink from emphasizing the obvious — that one may readily infer from the timing and circumstances of his application for insurance that Blacker knew that legal malpractice claims were on the horizon and deliberately sought to replace a policy that provided no coverage for claims arising out of securities work with one that did. Still, TIG does not rest its claim for rescission — at least at the summary judgment stage — on Blacker's alleged deceitful intent. Rather, TIG takes the position that, deceitfully or not, Blacker misrepresented his situation and thereby increased TIG's risk of loss; and that summary judgment was therefore warranted. We agree.

Our conclusion is based upon Blacker's response to Question 28(b) relating to potential claims.[4] By his negative answer to the second part of this compound question, Blacker denied that

---

[3]As observed by Judge Keeton, these provisions are "declaratory of long-standing common law principles defining the kind of false representations that can serve to avoid an insurance policy. . . . Under the common law, only a material misrepresentation by an applicant could invalidate the insurance policy. . . . Statements that misled the underwriter as to the nature of the risk being undertaken were considered material. . . . If an insured falsely states facts that heighten the risk being insured against, this misrepresentation is material." *Shapiro* v. *American Home Assur. Co.*, 584 F. Supp. 1245, 1249 (D. Mass. 1984).

[4]We do not rely upon Blacker's answer to Question 28(a) pertaining to actual claims. Although the term "claim" is not defined in the TIG application, it is defined in the TIG policy as "a demand received by the insured for money or services, including the service of suit, or the institution of alternative dispute resolution or arbitration proceeding against the insured; provided however, that proceedings brought against any insured solely to impose monetary sanctions shall not be considered a claim." It also is well-established in the caselaw that has developed around claims-made insurance that the term "claim" means a demand for compensation or relief. See, e.g., *Windham Solid Waste Mgmt. Dist.* v. *National Cas. Co.*, 146 F.3d 131, 133-134 (2d Cir. 1998), and cases cited. Using these definitions as our guide, we decline TIG's suggestion that we view the Wille letters as making an outright claim against

he had a "reasonable basis to foresee" that a professional liability claim would be made against him. Under any rational view of the facts, this answer was false.

By Blacker's own admission in his affidavit and deposition testimony, the SEC proceedings and the Wille letters placed him on notice of potential claims against him. He contends, however, that at the time he filled out the insurance application, it was his understanding that the Wille letters and the SEC proceedings only evidenced his exposure to claims under securities laws, and not for legal malpractice. Thus, he argues, a trier of fact could find that he did not have "a reasonable basis to foresee" that a professional liability claim, as distinct from a securities fraud claim, would be made against him. This position is without merit.

The crucial phrase, "reasonable basis to foresee," contains both subjective and objective elements. This language also appears in the insuring agreement of the TIG policy, which provides, in substance, that a claim will be covered only if, prior to the policy period, the insured did not have a "reasonable basis to foresee" that the claim would be made. In this context, the phrase has received the following sensible construction: "The provision refers to the insured's 'basis to foresee' that a claim would be made. 'Basis' can only refer to the insured's knowledge. However, the provision modifies the phrase with the term 'reasonable.' Consequently, the provision refers to what a reasonable attorney would foresee given the insured's knowledge." Carosella & Ferry, P.C. *vs.* TIG Ins. Co., U.S. Dist. Ct., Civ. A. No. 00-2344 (E.D. Pa. 2001).

We think it beyond dispute that the Wille correspondence placed Blacker on notice of potential legal malpractice claims and that a reasonable attorney would have foreseen such claims. The first Wille letter referred to specific transactions in which Blacker had acted as an attorney and plainly contemplated litigation against him in that capacity, as reflected by Wille's request for information about Blacker's professional liability insurance. The second letter, enclosing the tolling agreement, referred,

Blacker, thus calling into question the completeness of his disclosure in answer to Question 28(a). Rather, we think the Wille letters are properly characterized as placing Blacker on notice of a potential claim.

without limitation, to "any claim" that Baird might have against him. We do not think that Blacker's self-serving interpretation of what he gleaned from the Wille correspondence creates a genuine issue of material fact whether a reasonable attorney with the information that Blacker possessed would have appreciated that professional liability claims were implicated.

We also detect no genuine issue of material fact as to the second statutory requirement for rescission: that the misrepresentation increased the insurer's risk of loss. Here, TIG supported its motion for summary judgment with an affidavit of one of its underwriters averring that had Blacker disclosed the content of the letters received from the Wille firm, "TIG's underwriting standards would have required its underwriters to regard those circumstances as being material to the risk of loss under the policy and as increasing that risk. As a result, TIG would have declined to issue a professional liability insurance policy to Blacker, under any terms or conditions." This affidavit was uncontroverted, and, therefore, no issue of fact was presented as to whether Blacker's misrepresentation increased the risk of loss. See *Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 59-60 & n.6 (1997). In any event, even if no such affidavit had been offered, accurate information about an applicant's exposure to potential claims is so fundamental to claims-made underwriting, that a misrepresentation on this score may be said to increase the risk of loss as matter of law, without proof of subjective reliance by the insurer. See *Shapiro* v. *American Home Assur. Co.*, 584 F. Supp. 1245, 1249-1250 (D. Mass. 1984).[5]

The requirements of G. L. c. 175, § 186, having been satisfied as matter of law, TIG was entitled to summary judgment declaring its right to rescind.

*Judgment affirmed.*

---

[5]We need not address Blacker's contention at oral argument that, as a matter of legal theory, rescission may not be had if the insured's misrepresentation concerned a matter unrelated to any claim that ultimately eventuated. This argument was not adequately briefed; moreover, we see no basis for it on the facts of this case.