# CHICAGO INSURANCE COMPANY *vs.* ROBERT S. LAPPIN & others.[1]

No. 01-P-792.

Suffolk. March 14, 2003. - August 7, 2003.

Present: BROWN, GREENBERG, & MASON, JJ.

*Contract,* Insurance, Rescission. *Insurance,* Legal malpractice insurance, Misrepresentation, Construction of policy, Coverage, Interest. *Damages,* Attorney's fees. *Practice, Civil,* Attorney's fees.

In a civil action seeking a declaration of an insurer's right to rescind a legal malpractice insurance policy issued to the defendants, the judge correctly found that the defendants, in responding to a question on the insurance application regarding the existence of claims against them, had made no misrepresentations within the meaning of G. L. c. 175, § 186, that would permit rescission, where there were no matters constituting claims [773-778] or circumstances that might have resulted in a claim [778-779] at the time the defendants applied for their insurance; moreover, the judge correctly determined that the defendants were not on "inquiry notice" of certain matters that a reasonably diligent inquiry would develop [779-780], that the defendants could not be charged with an embezzling employee's knowledge [780], and that the policy was operative on the date that the defendants paid the premium in full [780-781].

In an insurance coverage action, the judge correctly determined that one defendant's negligence was not a single "occurrence" subject to the single claim limit of the legal malpractice insurance policy at issue, but rather consisted of discrete, unrelated breaches occurring over many years resulting in discrete, unrelated losses to numerous individuals, and that the aggregate limit of the policy applied. [781-782]

---

[1]Stanley A. Brooks; Dorothy C. Wallace; Eric F. Menoyo, R. Robert Woodberg, Jr., and Laurie J. Hall, as trustees of the Dorothy C. Wallace Family Trust and the DCW Grandchildrens' Trust; James W. Wallace, M.D., individually and as trustee under the will of Richard C. Wallace; Constance W. Gordon, individually and as trustee under the will of Richard C. Wallace; Linda C. Wallace, individually and as trustee of the James W. Wallace Irrevocable Trust; James W.H. Wallace, individually and as beneficiary of the James W. Wallace Irrevocable Trust; Joshua Wallace, individually and as beneficiary of the James W. Wallace Irrevocable Trust; and Elizabeth Culver, individually and on behalf of her minor daughter Erin Culver.

We shall refer to the defendants other than Lappin and Brooks as the Wallaces.

In an insurance coverage action, the judge erred in finding that prejudgment interest was not payable under the legal malpractice insurance policy at issue, where the policy obligated the insurer to pay on behalf of the defendants all sums for which they became legally obligated to pay as damages for covered claims, an element of which is prejudgment interest; moreover, pursuant to an amendatory endorsement attached to the policy, prejudgment interest awarded in an underlying action was not subject to the policy's stated limits of liability. [782]

This court found no error in a judge's award of attorney's fees and costs to the defendants in a civil action seeking a declaration of an insurer's right to rescind a malpractice insurance policy issued to the defendants, and agreed that one defendant's fees and costs incurred in defending an underlying action should be charged against the limits of the policy [782-783]; however, the judge erred in awarding fees and costs to third-party judgment holders [783-784].

This court concluded that the defendants in a civil action seeking a declaration of an insurer's right to rescind a malpractice insurance policy issued to the defendants were entitled to payment of their reasonable attorney's fees and costs incurred in the appeal of that action. [785]

CIVIL ACTION commenced in the Superior Court Department on February 23, 1996.

The case was heard by *Regina L. Quinlan*, J.

*Natasha C. Lisman* for the plaintiff.

*Thomas V. Urmy, Jr.* (*Michelle H. Blauner* with him) for the defendants.

*Christine Hughes*, for New England Legal Foundation, amicus curiae, submitted a brief.

BROWN, J. Chicago Insurance Company (Chicago) rescinded a malpractice insurance policy issued to attorneys Robert Lappin and Stanley Brooks and denied its duty to defend them. After a bench trial in Chicago's action seeking a judgment declaring its right to do so, a judge of the Superior Court found the policy to be in force and Chicago to be in breach of its duty. Various subsidiary rulings alternately salted and soothed the parties' wounds, bringing us here.

I

A. *Background.* Reserving some matters for later discussion, we take our facts from the trial judge's largely uncontested factual findings. Lappin, a sole practitioner sharing office space and expenses with Brooks and several other attorneys, hired

Linda Ortstein in 1991 as his secretary and administrative assistant. Lappin soon thereafter began easing his way into retirement, spending more time away from the office. Ortstein just as quickly assumed the role of servicing Lappin's remaining clients. In addition to screening and forwarding Lappin's mail and phone calls, she soon was acting as his clients' primary — often only — office contact, was handling client and office funds, and was regularly performing various other tasks, such as real estate closings, more typically and properly performed by attorneys. Lappin perceived nothing odd or dangerous in this arrangement because he had absolute trust in Ortstein's abilities and loyalty.

That trust was not well placed. Soon after her hire Ortstein began embezzling client funds, primarily from the Wallaces (see note 1, *supra*) but also from Lappin's other clients. These thefts, eventually exceeding $2.7 million, took place over a period of several years, from different individuals, and used such devices as phony mortgages through fictitious financing entities, forged documents, withheld account statements and other critical papers, and numerous unauthorized funds transfers. Ortstein was aided in her schemes by several well-placed confederates, including Fred B. Wilcon and Vincent Zullo, attorneys sharing office space with Lappin, and Barry Goodman, an investment broker overseeing many of the Wallaces' investments for Lappin. Despite what the trial judge characterized as "warning signs" appearing during this period, Lappin did not know of, participate in, or otherwise benefit from Ortstein's thefts.

B. *Insurance renewal.* Lappin and Brooks were insured through a program sponsored by the Boston Bar Association (BBA). In early 1995, Chicago, through its agent, Bertholon-Rowland Insurance Brokers, Inc. (Bertholon-Rowland), invited all participating lawyers, including Lappin and Brooks, to renew their policies. On May 4, 1995, both Lappin and Brooks filled out, signed, and sent Chicago's "Simplified Renewal Application" to Bertholon-Rowland. This application consisted of, in total, five questions. At issue here is question five, asking applicants, "Have any new claims or circumstances which may result in a claim arisen in the past policy period?" Lappin and Brooks responded, "no." Along with the renewal application,

Lappin and Brooks sent a twenty per cent premium down payment and a request that the balance due be financed.

Bertholon-Rowland "bound" the policy on May 10, 1995, returning the requested financing contract on May 25, 1995. Lappin and Brooks signed and returned the financing contract a few days later. The financing company paid the remaining balance due no later than June 8, 1995. Following some administrative misadventures not relevant here, the policy was "activated" by Bertholon-Rowland on July 20, 1995, with physical delivery taking place August 8, 1995. As reflected on the declarations page attached to the issued "claims made" professional liability policy, see, e.g., *Chas. T. Main, Inc.* v. *Fireman's Fund Ins. Co.*, 406 Mass. 862, 863-864 (1990), the one-year policy period commenced as of May 10, 1995.

C. *Discovery of Ortstein's embezzlements.* Upon learning that his long-time friend, Seymour March, wanted to sell his condominium, Lappin referred him to Brooks. Very soon thereafter, in June, 1995, Brooks discovered a foreclosure lien recorded on March's property. Upon inquiry, March told Brooks of an earlier refinancing through Ortstein and an entity called "LMF Financial." A problem then developed when the prior lender seemed not to understand it had been discharged; this, however, appeared to have been resolved when March sent this prior lender a mortgage discharge provided to him by Ortstein. On July 6, 1995, Brooks learned from the Secretary of State's office that "LMF Financial" did not exist. The next day Brooks learned that March's mortgage discharge was a fake.[2]

At roughly the same time, Lappin spoke with Constance Gordon, one of the Wallaces, who complained about an account statement showing a $40,000 debit she did not understand. Lappin assured her he would look into the matter. On July 11,

[2]In a pretrial affidavit, March averred that he learned of the forged discharge in February, 1995, and so told Lappin "somewhat later." In a later deposition (admitted at trial in lieu of testimony), however, March testified that he made monthly payments to LMF Financial until discovering Ortstein's forgery (his final payment was dated May 25, 1995), made no payments thereafter, and satisfied the foreclosure lien on July 18, 1995, within "days" of discovering the forgery. The trial judge resolved the conflict by rejecting the affidavit in favor of the July, 1995, discovery date. Given the conflicting nature of the evidence, we of course honor the trial judge's resolution.

1995, Lappin received Gordon's account statements along with various other documents. Those statements reflected numerous unauthorized withdrawals and transfers. Lappin also was surprised to see letters on his stationery above his forged signature. Ortstein admitted some of her activities that day when Lappin confronted her.[3] Additional investigation confirmed the existence, if not the extent, of Lappin's and his clients' problems. After meeting with the Wallaces, Lappin informed Chicago, on September 21, 1995, of potential claims by the Wallaces. Those claims materialized in January, 1996, when the Wallaces filed suit against Lappin and Brooks.

Although Chicago initially tendered a defense (subject to a reservation of rights), it soon thereafter filed this declaratory judgment action and then, on December 13, 1996, notified Lappin and Brooks of its decision to withdraw the defense and rescind the policy. Following a lengthy bench trial involving some 229 documentary exhibits and sixteen live witnesses, the trial judge declared the policy to be in force and made certain other rulings discussed *infra*. Chicago appealed, with Lappin, Brooks and the Wallaces cross-appealing.

## II

A. *Rescission*. General Laws c. 175, § 186,[4] allows an insurer to avoid a policy of insurance if the applicant's "misrepresentation" is either deliberate or material. *Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 57 (1997). See *Daniels* v. *Hudson River Fire Ins. Co.*, 12 Cush. 416, 425 (1853) (defining

---

[3]In an affidavit submitted in a different case, Lappin averred that his discovery of the unauthorized withdrawals and confrontation with Ortstein took place in "early 1995." At trial, however, Lappin repudiated this statement to the extent "[i]t describes my discovery as being in early '95, when in fact it was in July of 1995." As Lappin went on to explain, when he made the earlier statement he was depressed, under medical care, and having difficulty focusing on details. The trial judge credited Lappin's explanation and accepted July 11, 1995, as the date of first discovery. We again honor this resolution.

[4]As relevant here, G. L. c. 175, § 186, provides that no "misrepresentation . . . made in the negotiation of a policy of insurance by the insured . . . shall be deemed material or defeat or avoid the policy . . . unless such misrepresentation . . . is made with actual intent to deceive, or unless the matter misrepresented . . . increased the risk of loss."

"misrepresentation"). The trial judge found Lappin's and Brooks's "no" response to question five on the renewal application to be a fair statement of their knowledge at the time. There being no misrepresentation, she concluded, § 186 does not permit a rescission. See *Metropolitan Life Ins. Co.* v. *Burno*, 309 Mass. 7, 11 (1941); 6 Couch, Insurance § 82:3 (3d ed. 1997) (no duty to disclose "that which is unknown"). Chicago cries foul, arguing that several undisclosed matters constituted either "claims" or "circumstances which may result in a claim" within the meaning of question five.

1. *Actual claims.* It is well established that "claim" in this context means a demand for compensation or relief arising out of an applicant's negligent act or omission. See *TIG Ins. Co.* v. *Blacker*, 54 Mass. App. Ct. 683, 687 n.4 (2002). Chicago first argues that both Lappin and Brooks in fact were aware, at the time they submitted their application, of at least two such "claims," the so-called Susan Campbell and Wainwright Bank matters. Lappin and Brooks specifically discussed these matters among themselves, but ultimately decided not to disclose them to Chicago, in responding to question five.

a. *Susan Campbell.* In 1992, Campbell inherited two properties, 365 and 369 Beacon Street, from her mother. Lappin handled the mother's estate. Because there were insufficient funds to pay the estate taxes, Lappin suggested Campbell take out a $150,000 loan secured by the 369 Beacon Street property through Wainwright Bank. She did so. Lappin attended the closing. Later, Campbell asserted, she took out a second loan for $125,000 secured by the 365 Beacon Street property. Campbell had discussed this second loan not with Lappin, but with Ortstein, who, despite her promises, never forwarded to Campbell the completed loan paperwork. Campbell did, however, receive a check drawn on Lappin's client fund account for $49,803.50, purportedly representing the $125,000 loan proceeds less various payments made on Campbell's behalf.

Campbell soon became increasingly impatient with Ortstein's failure to forward the paperwork on the 365 Beacon Street loan, as well as with Lappin's unresponsiveness in resolving the situation (her calls to him, with one inconclusive exception, apparently being intercepted by Ortstein). She eventually asked Debo-

rah Masterman, an attorney working with Campbell on an unrelated custody dispute, to look into the matter. Masterman had no greater luck contacting Lappin. On August 8, 1994, at Masterman's suggestion, Campbell filed a complaint with the Board of Bar Overseers (BBO) about the lack of documentation. She amended the complaint in January, 1995, to include claims that the mortgage on the 369 Beacon Street property had not been recorded and that Lappin had not yet closed her mother's estate.

Lappin learned of Campbell's BBO complaints on March 13, 1995, when speaking to Masterman on unrelated matters. Lappin immediately spoke with Assistant Bar Counsel Yvonne Toyloy, obtained copies of Campbell's complaint, prepared a "to do" list to resolve the problems, and retained Brooks to correct the recording errors on the 369 Beacon Street property. Lappin then wrote to Masterman, informing her that he had not received her prior correspondence or letters from the BBO, and that he knew nothing about a $125,000 loan or mortgage on the 365 Beacon Street property.

Lappin then retained Brooks to represent him in the disciplinary proceeding and, together, they met with Toyloy on April 16, 1995. At that time, Lappin told Toyloy the mortgage on the 369 Beacon Street property soon would be recorded; he again disclaimed any knowledge of a $125,000 loan or mortgage on the 365 Beacon Street property. By May 2, 1995, Brooks had drafted all necessary documents to correct the recording problems. On May 10, 1995, Masterman returned the documents to Brooks without noting any other outstanding matters, and the 369 Beacon Street mortgage was recorded on May 16, 1995. At about this same time Lappin paid Masterman's very modest fees (less than $900) incurred in representing Campbell. The final fee dispute as to Campbell's mother's estate was resolved on May 25, 1995.

b. *Wainwright Bank.* On March 8, 1995, Wainwright Bank notified Zullo that the mortgage on Campbell's 369 Beacon Street property had not been recorded. Lappin received a copy of this letter on March 16, 1995. On March 22, 1995, Brooks learned of a second unrecorded Wainwright Bank mortgage, this one on 59 Commonwealth Avenue (which, despite the documen-

tation listing Lappin as closing attorney, actually was closed by Ortstein and Wilcon). After he became aware of the problems, Lappin retained Brooks to resolve the errors. The mortgage on the 369 Beacon Street property was resolved as noted. There were no intervening encumbrances. Brooks recorded the 59 Commonwealth Avenue mortgage on April 14, 1995. Although there had been two intervening encumbrances on the property, a tax lien and a gas bill, both had been discharged by May 4, 1995.

c. *Discussion.* We are not convinced that it was error for the judge not to find that either the Campbell or Wainwright Bank matters constituted "claims" within the meaning of question five of the renewal application. First, Chicago agrees that client fee disputes and bar disciplinary proceedings, although perhaps literally falling within the broad definition of "claim" discussed above, are not "claims" within the meaning of question five because Chicago's liability policy provided no coverage for such matters. The Campbell matter, of course, arose out of and was conducted as a bar disciplinary proceeding. We do not perceive how Masterman's request for her very modest fees or Brooks's retention removes it from that setting to convert it into a "claim." Certainly Chicago does not suggest its policy would have provided coverage had Lappin chosen to report the proceeding. Moreover, although Campbell's BBO complaints did reference her "dissatisfaction" with Lappin because of his "most unprofessional" conduct, Campbell did not allege any injury and made no present demand for relief, either monetary or otherwise. She instead asked only that the BBO "look into" the various matters referenced and provide any help it could. This, then, was not a "claim" within the meaning of question five. See *TIG Ins. Co.* v. *Blacker*, 54 Mass. App. Ct. at 685-687 & n.4 (letters stating that sufficient basis existed "on which a lawsuit could be commenced" did not constitute present "claim").

The Wainwright Bank matter resolves somewhat differently. The bank's March 8, 1995, letter — the only communication in the relevant time frame from the bank identified by Chicago as a "claim" — identifies the specific unrecorded mortgages at issue, references the "mishandling of the recording of the ap-

propriate title documents," and contains a sentence requesting that the letter's recipient resolve the errors and pay the bank's attorney's fees. In context, however, these assignments appear more in the nature of a request that the recipient complete unfinished work rather than a demand as of right. Moreover, the bank identified no then-existing injury, instead referencing only the "potential nullity of the original title insurance." On the whole, and particularly in light of the bank's subsequent February 14, 1996, letter,[5] sent after the matter ripened and which can only be characterized as a "claim," we are inclined to view the March 8, 1995, letter as more in the nature of a warning or threat of future action than a then-existing "claim."

We need not, however, decide that question because the bank's March 8, 1995, letter was addressed and directed not to Lappin, but to Zullo,[6] one of Ortstein's alleged confederates. Chicago does not suggest that Zullo at any time or in any way was affiliated with Lappin or Brooks, that his acts or knowledge may be imputed to Lappin or Brooks, or that Zullo was an insured under the relevant policy. Even if this letter properly can be characterized as a "claim" against someone, in other words, because it was directed to Zullo (rather than Lappin) it can not be said to be a "claim" against Lappin.[7] Compare *Employers Ins. of Wausau* v. *Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 142 (7th Cir. 1994). Cf. *Andy Warhol Foundation for the Visual Arts, Inc.* v. *Federal Ins. Co.*, 189 F.3d 208,

---

[5]This letter, addressed directly to Lappin, concluded with the following demand: "As a result of your negligence, the Bank has suffered damages in excess of $485,000.00 by virtue of your failure to properly secure the Bank's first mortgage interest in the Property. On behalf of the Bank, demand is hereby made for full recovery of all losses sustained by the Bank in connection with the closing of the Loan."

[6]The letter was addressed to "Vincent J. Zullo, Esq., Lappin, Rosen, Goldberg & Brooks, Sixty State Street, Fifth Floor." Zullo had no association with the firm listed; indeed, from what we can determine on this record, if a firm of that name ever existed it was not in existence at the time the letter was sent. Neither was "Lappin, Rosen, Goldberg & Brooks" a named insured under the relevant policy. The most that can be said on this record is that Zullo, Lappin, and Brooks each were sole practitioners, shared office space, and had the same mailing address.

[7]We note that Chicago's policy provides the following: " '[c]laim' means a demand for money or services . . . *naming an [i]nsured*" (emphasis added).

216 (2d Cir. 1999) (demand letter did not constitute "claim" where person demanding relief did not own claim asserted).

Nor does Wainwright Bank's March 16, 1995, cover letter to Lappin, enclosing a copy of the Zullo letter, somehow convert the Zullo letter into a "claim" against Lappin. That very brief cover letter merely encloses — "at [Lappin's] request" — the Zullo letter and its enclosures. It asserts no wrongdoing by Lappin, demands nothing, and closes merely by suggesting that if Lappin "should have any questions with the enclosed, please feel free to contact" the bank's representative. Compare *Federal Deposit Ins. Corp.* v. *Booth*, 82 F.3d 670, 675-677 (5th Cir. 1996); *Hill* v. *Physicians & Surgeons Exch. of Cal.*, 225 Cal. App. 3d 1, 6 (1990).

Finally, in considering the narrow question whether a "claim" against Lappin existed in the relevant time frame, we find it irrelevant that Lappin apparently understood the Zullo letter to refer to matters for which he, Lappin, was responsible, or that Lappin responded to the Zullo letter by retaining Brooks to resolve the matters noted. See *Federal Deposit Ins. Corp.* v. *Mijalis*, 15 F.3d 1314, 1331 (5th Cir. 1994) ("the expectations of the insured upon receiving or responding to a communication or inquiry cannot be determinative of whether a claim has been made because of the uncertainty such a rule would create"); *Hill* v. *Physicians & Surgeons Exch. of Cal.*, *supra*. Compare *Garfield Slope Hous. Corp.* v. *Public Serv. Mut. Ins. Co.*, 973 F. Supp. 326, 335 (E.D.N.Y. 1997) (that manager immediately removed carpet in response to letter from tenant, in which tenant complained about "fumes" from carpet and threatened lawsuit, did not transform letter into "claim" within policy's terms).

2. *"Circumstances."* If not "claims," Chicago argues, the Campbell and Wainwright Bank matters surely constituted "circumstances which may result in a claim" that Lappin and Brooks should have reported under question five. From the facts discussed above, and utilizing a standard nearly identical to the objective-subjective approach subsequently discussed in *TIG Ins. Co.* v. *Blacker*, 54 Mass. App. Ct. at 688 (inquiry is what reasonable attorney would foresee in like circumstances given attorney's knowledge at time), the trial judge found that Lappin

and Brooks in fact did not believe either the Campbell or Wainwright Bank matters could result in a claim because at the time of application both matters appeared to have been amicably resolved with only ministerial details yet to be completed; the judge also found that their belief objectively was reasonable. Chicago does not challenge the trial judge's fundamental factual findings in this regard and we cannot fairly say her conclusions based thereon are clearly erroneous. See *James F. O'Connell & Assocs.* v. *Transamerica Indem. Co.*, 61 Wash. App. 103, 110 (1991) (whether reasonable applicant in like circumstances would believe that dispute would be resolved short of claim and therefore need not be disclosed was question for fact finder).

3. *Remaining related issues.* As the trial judge noted, however, the Campbell and Wainwright Bank matters did not exist in a vacuum; at least in hindsight, certain "warning signs," if heeded, might have suggested the powder keg on which Lappin unknowingly sat. Thus, Chicago contends, Lappin was on "inquiry notice," see *Commonwealth* v. *Olivo*, 369 Mass. 62, 69 (1975), such that he and Brooks could be charged with full knowledge of those matters a reasonably diligent inquiry would develop, i.e., Ortstein's misdeeds. This would be the case provided the operative phrase is "could be charged" rather than "should as matter of law be charged." Whether notice is sufficient constructively to charge one with specific knowledge is a question ordinarily reserved to the fact finder. See *National Labor Relations Bd.* v. *Vapor Recovery Sys. Co.*, 311 F.2d 782, 787 (9th Cir. 1962). The trial judge resolved this question in Lappin's favor. Although different conclusions could have been drawn from the evidence presented, viewing the record as a whole we are not convinced a mistake was made. See *Castillo* v. *Massachusetts Gen. Hosp. Chelsea Memorial Health Care Center*, 38 Mass. App. Ct. 513, 517-518 (1995) (whether attorney should have been alerted to existence of cause of action after receiving client's medical records presented question of fact not amenable to resolution on summary judgment). See also *Michelin Tires (Canada) Ltd.* v. *First Natl. Bank of Boston*, 666 F.2d 673, 682 (1st Cir. 1981) (despite bank's actual knowledge of corporation's finances, factual findings supported conclusion that bank did not have actual, and could not be charged with constructive, knowledge of corporation's fraud).

For like reasons, we reject Chicago's assertion that coverage should be denied under the provision of the policy indicating that coverage would be provided for acts or omissions occurring prior to the effective policy date only if the insured "had no reasonable basis to believe that the [i]nsured had breached a professional duty or to foresee that a [c]laim would be made against the [i]nsured." We thus have no need to decide whether invoking this provision to deny coverage on the ground that Lappin negligently failed to appreciate his negligence would violate public policy by negating the very purpose of the insurance, protection against liability for negligence. See *Liberty Mut. Ins. Co.* v. *Tabor*, 407 Mass. 354, 358 (1990).

Neither may Lappin be charged with Ortstein's knowledge, either of her own defalcations or of Lappin's negligence. See *GTE Prods. Corp.* v. *Broadway Elec. Supply Co.*, 42 Mass. App. Ct. 293, 299-300 (1997), citing Restatement (Second) of Agency § 282 (1958). This is not a case where Ortstein, acting innocently and otherwise within the course and scope of her employment, simply failed to impart information. Compare *Sunrise Props., Inc.* v. *Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 67 & 68 n.9 (1997) ("[i]f, however, the agent fails to reveal [a relevant] fact in order to accomplish some fraud of his own antagonistic to the interests of the principal, the principal is not bound").

We next reach the question of the policy's operative date. "Statements made in an application for insurance are in the nature of continuing representations." *Ayers* v. *Massachusetts Blue Cross, Inc.*, 4 Mass. App. Ct. 530, 536 (1976). Thus, an applicant has a duty to inform the insurer of any known changes rendering his or her initial representations untrue until such time as the policy becomes "operative." See *Gabbett* v. *Connecticut Gen. Life Ins. Co.*, 303 Mass. 433, 435 (1939); 6 Couch, Insurance § 82:3 (3d ed. 1997). If, as Chicago urges, we accept the policy's "operative" date as July 20, 1995 (the policy's "activation" by Bertholon-Rowland), arguably Lappin and Brooks may be charged with a "misrepresentation" because they failed immediately to update their application to include the information discovered a few days earlier. The trial judge, however, determined June 8, 1995 (the date the premium was fully paid), to be the policy's operative date.

There was no error. When a contract becomes "operative" for these purposes is subject to differing interpretations depending on the peculiarities of the specific circumstances and policy language under consideration. Turning to the case at hand, the policy was a renewal, offered to all attorneys previously insured under the BBA's program. Chicago greatly simplified the application process for renewing attorneys such as Lappin and Brooks, and its acceptance essentially was automatic.[8] Chicago accepted Lappin's and Brooks's initial payment, bound the policy, arranged for the financing of the remaining premium, and, on June 8, 1995, accepted payment in full.

Lacking policy language directing a contrary result, as here, a reasonable insured fairly would assume coverage was effective, and the policy was "operative," on a renewal policy when the insurer accepted full payment approximately one month after notifying the insured that the policy had been bound. See *Crossley* v. *State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 357-358 (1992). Viewed in this light, Chicago's subsequent policy "activation" and physical delivery were little more than ministerial procedures devoid of meaningful content. Any other result would permit an insurer to receive the benefits of the insured's prompt payment while avoiding, at its sole and unbargained-for option, the duties associated therewith. See *McCollum* v. *Continental Cas. Co.*, 151 Ariz. 492, 494-495 (Ct. App. 1986).

B. *Policy limits.* The policy specified a $2 million aggregate limit, a single claim limit of $1 million, and provided that "[a]ll claims arising from the same related negligent act, error or omission or personal injury shall be considered a single claim . . . and shall be subject to the same limit of liability." Chicago here attempts to characterize Lappin's negligence merely as a continuing failure to supervise, thus constituting a single "occurrence" subject to the policy's single claim limit. See, e.g., *RLI Ins. Co.* v. *Simon's Rock Early College*, 54 Mass. App. Ct. 286, 294-295 & n.11 (2002). The trial judge found, however, Lappin's negligence was not singular, but multiple, with discrete, unrelated breaches occurring over many years resulting in discrete, unrelated losses to numerous individuals. The ag-

---

[8]Indeed, we are referred to no instance in which Chicago rejected a renewing applicant or charged an increased premium, regardless of claims history.

gregate liability limit thus applies. See *Federal Dep. Ins. Corp.*
v. *Mmahat*, 907 F.2d 546, 553-554 (5th Cir. 1990), cert. denied,
499 U.S. 936 (1991). Cf. *Slater* v. *United States Fid. & Guar.
Co.*, 379 Mass. 801, 806-809 (1980); *Worcester Ins. Co.* v. *Fells
Acres Day Sch., Inc.*, 408 Mass. 393, 416-417 (1990).

C. *Prejudgment interest.* An amendatory endorsement at-
tached to the policy provides as follows: "Prejudgment interest,
where payable under this policy, will be in addition to the limits
of liability stated in the declarations." The trial judge concluded
that this endorsement did not apply because nothing in the
policy specifically "provides that prejudgment interest is pay-
able by Chicago." We disagree.

The insurance contract obligates Chicago to pay on behalf of
Lappin and Brooks "all sums" for which they became "legally
obligated to pay as damages" for covered claims. Absent
language to the contrary, as in this case, prejudgment interest is
an element of "damages" payable under the policy. See *Mayer*
v. *Medical Malpractice Joint Underwriting Assn. of Mass.*, 40
Mass. App. Ct. 266, 269-270 (1996) (construing nearly identical
policy language). See also *Turcotte* v. *DeWitt*, 333 Mass. 389,
392 (1955). Had Chicago wished to avoid such liability, it could
easily have done so by drafting its policy and endorsements
differently. Given Chicago's choice of language, however, there
is no reason to read such an exclusion into the policy. See
*Liberty Mut. Ins. Co.* v. *Tabor*, 407 Mass. at 362.

Contrary to the trial judge's conclusion, in other words,
prejudgment interest indeed is payable under the policy. Thus,
pursuant to the endorsement's unambiguous language, prejudg-
ment interest awarded in the underlying action is not subject to
the policy's stated limits of liability. Compare *Davis* v. *Allstate
Ins. Co.*, 434 Mass. 174, 180-181 (2001) (postjudgment inter-
est); *Fratus* v. *Republic Western Ins. Co.*, 147 F.3d 25, 28-29
(1st Cir. 1998) (postjudgment interest).

D. *Attorney's fees and costs.* We find no error in the award of
attorney's fees and costs to Lappin and Brooks. See *Preferred
Mut. Ins. Co.* v. *Gamache*, 426 Mass. 93, 98 (1997); *Rubenstein*
v. *Royal Ins. Co. of Am.*, 429 Mass. 355, 360 (1999); *Hanover
Ins. Co.* v. *Golden*, 436 Mass. 584, 588 (2002). Provided an
a ard is "not incommensurate with an objective evaluation of

the services performed . . . '[t]he award of such costs generally rests in sound judicial discretion . . . [and] ordinarily ought not to be disturbed.' " *Ross* v. *Ross*, 385 Mass. 30, 38-39 (1982), quoting from *Smith* v. *Smith*, 361 Mass. 733, 738 (1972). See *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324-326 (1993). Although we generally frown on reconstructed documentation of fees and costs, we are satisfied that the documentation in this case, which might have been better, was sufficient to provide the trial judge a proper decisional foundation, and that the awards actually made — $416,854.39 to Lappin and $66,005 to Brooks incurred in defending the instant declaratory relief action, and $213,982.17 to Lappin incurred in defense of the underlying tort claims — were commensurate with and properly allocated to the work performed.

A question arises whether Lappin's fees and costs incurred in defending the underlying action should be charged against, or are in addition to, the policy's stated limit of liability. The trial judge found them properly to be charged against that limit. We agree. In declining to defend, Chicago "at least acquiesced in defence of the insured by counsel retained by him," *Magoun* v. *Liberty Mut. Ins. Co.*, 346 Mass. 677, 685 (1964), and thereby became obligated to reimburse Lappin those "[c]laim [e]xpenses," defined in the policy as including "all other fees, costs, and expenses resulting from the . . . defense and appeal of a . . . suit," incurred by him. See *Jefferson Ins. Co.* v. *National Union Fire Ins. Co. of Pittsburgh, Pa.*, 42 Mass. App. Ct. 94, 104 (1997). "Claim [e]xpenses," including defense costs, expressly are included within the policy's "[l]imit of [l]iability." Given the absence of record support for Lappin's claim that he suffered some additional, albeit unspecified, compensable loss in connection with having to defend the underlying action, we find no error. Cf. *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 762-765 (1993) (applying normal contract damages principles to insurer's breach of duty to defend).

The $512,908.91 fees and costs award to the Wallaces stands on a far different footing. Under the so-called "American rule," Massachusetts generally has prohibited "recovery of attorney's fees and expenses in a civil case in the absence of either an

agreement between the parties, or a statute or rule to the contrary, and this principle has been applied to deny recovery of attorney's fees and expenses in declaratory judgment actions." *Preferred Mut. Ins. Co.* v. *Gamache*, 426 Mass. at 95. We are directed to no agreement, statute or rule authorizing the Wallaces' award. The opinion in *Flattery* v. *Gregory*, 397 Mass. 143, 148-151 (1986), relied on by the defendants, does not suggest we ignore this critical omission.

We may accept for argumentative purposes that in "entering into a contract the very object of which is the payment . . . of judgments against" an insured, both insurer and insured "intend the injured third-party judgment holder to benefit from their contract." *Id.* at 151. See G. L. c. 175, § 113. That a third-party judgment holder may thereby have a right of recovery against an insurer, however, does not itself justify an award of attorney's fees incurred in obtaining such policy proceeds as may be available. See *Saunders* v. *Austin W. Fishing Corp.*, 352 Mass. 169, 173-174 (1967) (third-party judgment holder not entitled to fee award in successful action to reach and apply insurance proceeds under G. L. c. 175, § 113).

The basis of the narrow exception announced in *Gamache* and its progeny affirms this distinction. A liability policy such as Chicago's, it may be recalled, contains not one, but at least two essential promises: to indemnify and to defend. See *Davis* v. *Allstate Ins. Co.*, 434 Mass. at 180. Whether the Wallaces are intended third-party beneficiaries as to the first (with which *Flattery* was concerned) is a question we need not, and do not, decide; it is only the latter promise, to defend, that shields the insured from litigation expense. Thus, a fee award to an insured who successfully establishes the insurer's duty to defend serves to ensure that the insured will not in practice lose through enforcement that which he should have had as of contractual right — the right to be free of the expense of defending suits brought against him. See *Rubenstein* v. *Royal Ins. Co. of Am.*, 429 Mass. at 358-359.

A fee award to the Wallaces would serve no such beneficial function. As owners of those claims against which Lappin was to be defended, the Wallaces certainly cannot be said to be beneficiaries, intended or otherwise, of Chicago's promise to defend. Their award must be vacated.

### III

Lappin and Brooks are also entitled to payment by Chicago of their reasonable attorney's fees and costs incurred in this appeal. See *Rubenstein* v. *Royal Ins. Co. of Am.*, *supra* at 361. They may submit petitions for such fees and costs, together with necessary supporting material, within fifteen days of issuance of the rescript in this case, in accordance with the procedure outlined in *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989). Chicago shall have fifteen days thereafter to file a response.[9]

So much of the judgment as declares the award of prejudgment interest in the underlying action to be within the policy's stated limits of liability, and as awards attorney's fees and costs to the Wallaces, is reversed. In all other respects, the judgment is affirmed.

*So ordered.*

---

[9]Because Lappin, Brooks, and the Wallaces were represented jointly on appeal, the single justice, in considering the amount of the award, shall determine what portion of the fees and costs are attributable to the Wallaces and are thus not reimbursable.