BOSTON MUTUAL INSURANCE COMPANY, Plaintiff, Appellee,

v.

NEW YORK ISLANDERS HOCKEY CLUB, L.P., Defendant, Appellant,

v.

Blumencranz, Klepper, Wilkins & Dubofsky, Ltd., d/b/a BWD Group, Ltd., Third–Party Defendant, Appellee.

No. 98–1456.

United States Court of Appeals, First Circuit.

Heard Sept. 17, 1998.

Decided Jan. 19, 1999.

**94**

Ted Poretz with whom Steven D. Guggenheim, Alyson M. Weiss, Wende S. Ascher, Richards & O'Neil, LLP, Charles M. Campo, Jr., and Kassler & Feuer, P.C. were on brief for New York Islanders Hockey Club, L.P.

Alan G. Miller with whom Thomas M. Elcock and Morrison, Mahoney & Miller were on brief for Boston Mutual Insurance Company.

Barbara A. Sheehan with whom Michael T. Walsh, Maura Bleichert Lee and Walsh & Sheehan, LLP were on brief for Blumencranz, Klepper, Wilkins & Dubofsky, Ltd.

Before BOUDIN, LYNCH and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

On or about November 14, 1994, the New York Islanders Hockey Club (the "Islanders") submitted an application to Boston Mutual Insurance Company ("Boston Mutual") and various Lloyd's of London underwriters to insure its star player, Brett Lindros, for temporary total disability as part of the National Hockey League's group insurance plan. The Islanders failed to disclose in the application that, before becoming a member of the team, Lindros had sustained three concussions within a span of a little more than a year, that he had received medical treatment for each of these head injuries, and that he had experienced headaches and dizziness from these episodes.

The facts as to Lindros's history of head injuries are uncontested. In September 1992, Lindros suffered head trauma while trying out for the Canadian National team. He experienced temporary impaired vision and a nagging headache for most of the day. Dr. Paul Thorne, a physician for that team, examined Lindros, finding that the left side of his visual field was "abnormal." Dr. Thorne read a CT scan of Lindros's brain to show signs of brain edema, although he later revised his interpretation of the CT scan to normal after obtaining the radiologist's expert judgment. Dr. Thorne discussed with Lindros's father the risks of reinjury and told Lindros to refrain from full-contact hockey for a week.

Sometime in November 1992, Lindros sustained a second head injury while playing for the Kingston Frontenacs. In the heat of a game, after his helmet had fallen off, he was body-checked by an opposing player and his head banged against the boards. After the game, Lindros complained of impaired vision. On the suggestion of his mother, who is a nurse, Lindros visited Kingston Hospital. After being examined by medical staff in the emergency room, he was instructed to avoid physical contact for seven days. This inci-

dent is documented by Dr. Thorne accordingly: "Nov[ember] 92—dizzy, hit l[eft] temple, l[eft] homonymous hemianopsia 30–60 minutes."

Lindros suffered a third blow to the head while playing for Team Canada in Norway in November 1993, when he was again "taken into the boards." Feeling "disoriented" and "fuzzy," he left the game but later returned to play. Afterward, he was diagnosed by a hospital therapist with "concussive head injury from contact [with] boards/dasher." MRI and EEG tests two weeks later revealed no abnormalities, and Dr. Thorne authorized Lindros to play in an upcoming tournament but warned Lindros that "the risks still, despite [his recovery], of further concussion is slightly higher," and that in his view "the more concussions he has, there is a risk of permanent brain damage when that happens."

The Boston Mutual application, which the Islanders completed in 1994 to secure coverage for Lindros, posed a series of medical questions in two different parts; it specified that part I was to be completed "by" the player and a designated club official and part II "by" the player and club physician. The part I questions asked *inter alia* what the club knew about past injuries to the player (directing that the club, its physician and trainer "must be consulted") and was to be signed by someone on behalf of the club; part II asked detailed medical questions and was to be personally signed by the player and club physician. In fact, the team trainer, Edward Tyburski, answered all of the questions on the application without first consulting the club physician, Dr. Gerald Cordani, or Lindros himself. Lindros and Dr. Cordani simply signed the relevant forms in the appropriate places, as requested by the Islanders, apparently without verifying the accuracy of the answers, as the trainer had requested them to do.

The completed application did not disclose any of Lindros's three prior concussions even though a number of questions—if answered accurately—called for such disclosures. In particular, question (5)(b) of part I asked whether the club knew if Lindros had experienced any pain or discomfort for which he

sought medical advice or treatment within the previous year; the form asked for details if the applicant answered in the affirmative. The Islanders's answer noted only Lindros's January 1994 knee sprain. The club's own physical examination of Lindros in September 1994 had apprised it of at least one of his prior concussions.

Similarly, none of Lindros's concussion-related examinations were revealed by Lindros or the club doctor in response to question 4(a) of part II, which asked if Lindros had undergone a nonroutine examination by a physician within the past three years (only the knee injuries were disclosed in response). Although question 5(g) of part II inquired as to whether Lindros had ever had any known indication of or been treated for dizziness or headache, the application answered "no." There were other seemingly inaccurate answers but the district court declined to rely upon them, saying that they had not been timely identified as errors.

Lindros retired at the end of 1995 after suffering three more serious concussions in short succession while playing as an Islander. Shortly thereafter, the Islanders filed a claim under the insurance policy, seeking to recover approximately $4.3 million—the bulk of Lindros's salary for the period remaining in his 5–year contract term. According to the policy, once a deductible is met and an insured player misses 30 consecutive regular season games due to a disability, the policy reimburses the team for 80 percent of the player's salary during his disability. The claim was denied by the insurers on the ground that the Islanders failed to reveal relevant information on their insurance application by omitting Lindros's history of prior head injuries.

Boston Mutual then commenced this action to rescind the policy. The Islanders counterclaimed for payment under the policy and impleaded third-party defendant Blumencranz, Klepper, Wilkins & Dubofsky, Ltd. ("BWD"), the National Hockey League's insurance broker that administers the insurance program. The Islanders alleged, *inter alia*, that BWD as agent breached its duty of care, assertedly owed to the Islanders, by failing to forward to Boston Mutual Lindros's

1994 team physical which indicated that he had had at least one concussion.

After discovery, Boston Mutual and BWD moved for summary judgment. The district court granted the motions. It rejected recovery under the policy, holding that the Islanders intended to deceive the underwriters and, alternatively, that the Islanders's misstatements had the effect of increasing the insurers' risk of loss. On the Islanders's claim against BWD, the court said that BWD's failure to verify the accuracy of the application or submit documentary materials on the Islanders's behalf did not breach any putative duty of care. The Islanders now appeal.

■ We review the district court's entry of summary judgment *de novo*, viewing the evidence in the light most favorable to the Islanders. *See Iglesias v. Mutual Life Ins. Co. of New York*, 156 F.3d 237, 239 (1st Cir.1998). The policy at issue is governed by Massachusetts law, which permits an insurance company to avoid a policy based on the misrepresentation of the insured, if "such misrepresentation or warranty is made with actual intent to deceive, or ... the matter misrepresented ... increased the risk of loss." Mass. Gen. Laws ch. 175, § 186. If either prong of the test is satisfied, an insurer may rescind a policy.[1]

The application did contain misrepresentations: as already described, it failed to reveal the three head injuries that occurred in 1992 and 1993 even though disclosure was clearly called for by several of the questions. Whether the false answers were given with actual "intent to deceive" or the false answers "increased the risk of loss" are more difficult questions. We begin with the district court's determination that actual intent to deceive was established as a matter of law.

In resolving the issue, our first problem is to decide what is meant by the phrase "actual intent to deceive" as used in the Massachusetts statute. Massachusetts law sometimes appears confusing on this issue, but a careful reading of the cases reveals a pattern to which most of the language and outcomes can be fit. Of course, the Massachusetts Supreme Judicial Court has the last word on this issue; but in the meantime, we think a brief discussion may be helpful to district courts faced with this issue.

In general, a false answer does not itself automatically prove deceitful intent—the mistake could easily be a reasonable one or merely negligent.[2] At the other end of the spectrum, a false statement in an insurance policy, known by the applicant to be untrue and deliberately intended to induce reliance on the false statement, indicates actual deceit. *See Danca v. Taunton Savings Bank*, 385 Mass. 1, 429 N.E.2d 1129 (Mass.1982). The real difficulty lies between these end points, especially with false statements that might be described as reckless.

We agree with the district judge that actual deceit may exist in certain cases where an applicant makes a false statement without actual knowledge of its falsity.[3] Imagine a case where—although not certain that his answers are false—an applicant knows full well that he is ignorant as to their truth or falsity and intends to deceive by conveying a false impression that he believes the answers to be true. *Cf. United States v. London*, 66 F.3d 1227, 1241 (1st Cir.), *cert. denied*, 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996) (standard "willful blindness" instruction).

■ Yet in other cases, an applicant's false statement might be reckless, even suggestive of fraud, but fall short of compelling an infer-

1. One case says that to prevail, an insurer must show both actual intent to deceive *and* show that the deception was material (*i.e.*, that it increased the risk of loss), *see Employers' Liability Assurance Corp. v. Vella*, 366 Mass. 651, 321 N.E.2d 910, 913 (Mass.1975). However, the statutory language is clearly disjunctive and is clearly so treated in most cases.

2. *See Andover Newton Theological Sch., Inc. v. Continental Cas. Co.*, 409 Mass. 350, 566 N.E.2d 1117, 1118–19 (Mass.1991); *Rappe v. Metropolitan Life Ins. Co.*, 322 Mass. 438, 77 N.E.2d 641, 642 (Mass.1948).

3. *See Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir.1987) (trade deception); *Powell v. Rasmussen*, 355 Mass. 117, 243 N.E.2d 167, 168 (Mass.1969) (deceit in sale of corporate stock).

ence of deliberate deception or bad faith. Put more simply, the recklessness rubric may cover some cases in which the applicant is actually deceitful but also others in which he is simply careless in the extreme. In the latter instance, Massachusetts does not impute actual deceit as a matter of law. *Cf. Sullivan v. John Hancock Mutual Life Ins. Co.*, 342 Mass. 649, 174 N.E.2d 771, 774 (Mass.1961); *McDonough v. Metropolitan Life Ins. Co.*, 228 Mass. 450, 117 N.E. 836 (Mass.1917).

Turning to the present facts, we agree with the district judge that the Islanders's conduct was indisputably reckless in the sense that it was careless in the extreme. But whether a jury would be compelled to conclude that "the Islanders" consciously conveyed a false impression is a more difficult issue, especially because we are dealing with the state of mind of three different individuals who knew only different parts of the puzzle: the trainer who completed the application but whose state of knowledge as to the past concussions is unclear, and Lindros and the club doctor who knew more but may never have read the application.

■ The gap as to subjective intent might be filled by a more detailed assessment, but this course is unnecessary given the district court's alternative ground for summary judgment, namely, its conclusion that the false statements were material as a matter of law under section 186. "Materiality" may mean different things in different contexts. But the Massachusetts statute provides a definition to focus the inquiry: a false answer is material under section 186 if "the matter misrepresented ... increased the risk of loss" for the insurer. Mass. Gen. Laws ch. 175, § 186.

An understanding of why this requirement exists informs its interpretation. On this branch of the Massachusetts statute, an innocent or merely carelessly false statement may avoid the policy. Absent actual deceit, the materiality requirement limits avoidance to cases where an accurate answer could reasonably have affected an insurer's choices—for example, whether to insure the applicant, whether to impose exclusions, whether to charge a higher premium—decisions largely governed by perceptions as to the likelihood and magnitude of loss.

■ At the same time, the statute does not go so far as to require proof by the insurer that it *would* have acted differently (although such proof certainly tends to establish materiality, *e.g., Barnstable County Ins. Co. v. Gale*, 425 Mass. 126, 680 N.E.2d 42 (Mass.1997)). Where the misstatement would "naturally influence" the judgment of the underwriter, *id.* at 44, it may be material without proof that the insurer would ultimately have refused to insure the applicant or would have charged more for the insurance.[4] This objective definition is broadly consistent with the way "materiality" is defined in other contexts. *See, e.g., United States v. Corsino*, 812 F.2d 26, 30 (1st Cir. 1987) (finding statement material for purposes of federal anti-fraud statute if it has a "natural tendency to influence ... a governmental function").

Whether a misstatement increases the insurer's risk of loss "is ordinarily a question of fact." *Keefe v. John Hancock Property & Cas. Ins. Cos.*, No. 9429, 1997 WL 733843, at *4 (Mass.App.Div. Nov.17, 1997). Nevertheless, the issue is often resolved as a matter of law under Massachusetts law where the health condition or occurrence falsely concealed is objectively serious enough that no reasonable person could doubt that it increased the risk of loss.[5] If the cases are

4. *See Shapiro v. American Home Assurance Co.*, 584 F.Supp. 1245, 1249–50 (D.Mass.1984) (finding misstatement to be material without proof of subjective "reliance"); *see also Doulames v. Prudential Insurance Co.*, 1 Mass.App.Ct. 871, 307 N.E.2d 17, 18 (Mass.App.1974) (holding that increased risk may be inferred either from objective scientific evidence or from testimony as to insurer's practice); *Locke v. Royal Ins. Co.*, 220 Mass. 202, 107 N.E. 911, 912 (Mass.1915) (same).

5. *See, e.g., Northwestern Mutual Life Ins. Co. v. Iannacchino*, 950 F.Supp. 28 (D.Mass.1997) (serious depression); *Pahigian v. Manufacturers' Life Ins. Co.*, 349 Mass. 78, 206 N.E.2d 660 (Mass. 1965) (Hodgkin's disease); *Ayers v. Massachusetts Blue Cross, Inc.*, 4 Mass.App.Ct. 530, 352 N.E.2d 218 (Mass.App.1976) (cancer symptoms).

sometimes hard to reconcile,[6] this is partly because they cover almost a century of changing medical knowledge and partly because of variations in the background facts (*e.g.*, what was asked, what was disclosed, and in what circumstances).

Here, the primary witness for the insurers as to risk was Dr. John Brennan, a consulting physician to the National Hockey League's underwriters. Dr. Brennan opined by affidavit that had he known of Lindros's prior injuries, he would have advised the insurers at a minimum to exclude insurance coverage for head injuries and brain damage. His deposition indicated that repeated head injuries can produce cumulative brain damage. And this testimony is consistent with the opinion expressed by Dr. Thorne, one of Lindros's physicians, regarding the risk of permanent damage from repeated injury.

Yet Dr. Brennan was a less-than-ideal witness for the insurers in several respects: he does not specialize in neurology and his experience with repeated head trauma apparently involved boxers exclusively (for whom cumulative effects are well documented but whose repetitive head trauma could be distinguished from the kind of less frequently repeated injury suffered by hockey players). And although Dr. Brennan testified to his understanding that the effect of brain injuries can be cumulative, he did not claim a close acquaintance with the scientific literature on the subject.

The Islanders's own expert, Dr. Robert Cantu, had strong qualifications and directly disputed the proposition that cumulative brain damage necessarily results from repeated injury of the kind suffered by hockey or football players (rather than boxers). Although impeached to some extent by his own previous writings, Dr. Cantu said that it depends on the individual whether such cumulative effects will be manifested. And in Brett Lindros's case specifically, he found no evidence of cumulative damage from examining his medical records.

However, what Dr. Cantu did not dispute is the statistical conclusion, exemplified by a study of "several thousand high school football players" finding that players who had sustained one concussion were four times more likely to suffer another than those players who had never had one. Whether such data is a function of some athletes' more aggressive tactics (as Dr. Cantu himself believes), their greater susceptibility based on past injuries, or merely an individual predisposition to head injury matters not. It is enough that the defendant's own expert effectively conceded that prior concussions have been shown significantly to increase the risk for the class.

The question remains whether the increased risk should be disregarded if, as the Islanders claim to be true, the insurers would *in fact* have issued the same policy for Lindros, without any exclusion, and without any change in premium, even if they had known all of the information about the prior concussions. The insurers offered affidavit evidence that the information would or could well have altered the outcome; but the affiant himself had admitted in deposition that coverage had been granted without further investigation to 20 or more previously concussed players; and a separate study offered by the Islanders found no case, among a large sample, where a denial or exclusion under this policy had been based on such a disclosure.

There are various reasons why a player might be covered without any change in the policy despite increased risk: policies "group" risks, actuaries draw classification lines at different points, and insurers who have a major continuing policy covering an important sports industry have plenty of reasons to be accommodating to the insured teams. In this case, the evidence of past practice does not raise a disputable issue as to whether the *objective* risk was increased. It certainly does raise the question whether the new information would have altered the insurers' response to the application.

---

**6.** *See, e.g., Kaufman v. National Casualty Co.*, 342 Mass. 412, 174 N.E.2d 35 (Mass.1961) (holding that a history of heart attacks was not material as a matter of law); *see also Schiller v. Metropolitan* *Life Ins. Co.*, 295 Mass. 169, 3 N.E.2d 384, 388 (Mass.1936) (listing serious medical conditions that are not material as a matter of law).

The Massachusetts statute on its face makes proof of objective risk sufficient, and the cases look in this direction although none is conclusive. *See* note 4, above. Further, given a false application, there are reasons to avoid a retrospective inquiry that can rarely be answered with perfect confidence: here, for example, it is not clear that the underwriters had ever insured a player with as many as three prior concussions *and* the several troubling symptoms that accompanied them in Lindros's case. Under Massachusetts law, it is enough that the application was false in substantial respects and that the information omitted did materially increase the risk to the insurer.[7]

A final issue remains. The Islanders argued that the trial court erred by entering judgment in favor of BWD because the evidence permitted a jury to find that BWD breached its alleged duty of care to the Islanders when it failed to forward Lindros's 1994 team physical to the underwriters. The physical would have shown at least one prior concussion and—if forwarded—would have provided the insurers with some additional warning.

The district court properly found that, even assuming BWD was the Islanders's agent, no rational jury could conclude that BWD failed to fulfill its obligation to the Islanders. It is undisputed that BWD (as the National Hockey League's broker) informed the Islanders's own insurance broker, Sterling & Sterling, that team physicals were no longer required after January 1993, and that BWD also relayed that change of policy to the Islanders directly. Although BWD occasionally forwarded team physicals after this date, it was under no obligation to do so.

Once BWD returned Lindros's 1994 team physical to the Islanders, citing the rule change, the Islanders never requested that BWD send it on to the underwriters. As the trial court determined, BWD had no independent duty to confirm the veracity of the statements contained in the Islanders's applications for the insurance coverage and did not sign the forms; it merely fulfilled the administrative task of checking to see if the questions asked on the forms had all been answered.

*Affirmed.*

---

7. We need not decide whether a different outcome might be urged where the misstatement was entirely innocent or where conclusive evidence (*e.g.,* a formal classification) showed indisputably that an increased risk would not have mattered. Neither of these circumstances is present in this case.