# United States Court of Appeals
## For the First Circuit

No. 06-1050

FEDERAL INSURANCE CO.,

Plaintiff, Appellant,

v.

HPSC, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Smith,[*] District Judge.

Bradford R. Carver, with whom CharCretia V. DiBartolo, Stephen R. Swofford and Hinshaw & Culbertson LLP were on brief, for appellant.
Jillian B. Hirsch, with whom William Shields and Day, Berry & Howard LLP were on brief, for appellee.

March 15, 2007

[*]  Of the District of Rhode Island, sitting by designation.

**TORRUELLA**, **Circuit Judge**. This case arises from a failed attempt by defendant-appellee HPSC, Inc. ("HPSC") to recover an embezzlement loss under an executive protection insurance policy issued by plaintiff-appellant Federal Insurance Co. ("Federal"). Federal brought this declaratory judgment action against HPSC seeking rescission of the policy based on a misrepresentation made by HPSC in its 2001 insurance renewal application. HPSC counterclaimed, seeking recovery under the policy and damages for unfair and deceptive trade practices. Judgment was entered in favor of HPSC on all claims. Federal appeals, claiming that the district court admitted irrelevant and prejudicial evidence on the materiality of HPSC's misrepresentation and that it is entitled to judgment as a matter of law on all claims. After carefully reviewing the record, we affirm.

## I.  Relevant Facts

On May 28, 2002, HPSC reported to its long-time insurer, Federal, that an officer of its asset-based lending subsidiary American Commercial Finance Corp. ("ACFC"), Kevin Morrison, had embezzled $4.7 million over the previous five years. HPSC submitted proof of loss to Federal on July 9, 2002, pursuant to its Executive Protection Policy, which provided for $1,000,000 of employee theft coverage, subject to a $25,000 deductible. With its claim, HPSC included an investigative report by PricewaterhouseCoopers (the "PwC report") indicating that the theft

occurred due to Morrison's unsegregated control over account activities. The PwC report stated that Morrison "exercised sole control over the factoring [of accounts receivable] business at ACFC and had full authority to disburse funds, collect payments, reconcile accounts and report financial performance." As a result, "ACFC had insufficient segregation of duties in the factoring operation."

The investigation of HPSC's claim was assigned to Federal claims examiner Anna MacKay. Upon reading the PwC report, MacKay concluded that Morrison both reconciled bank statements and signed checks on the same ACFC accounts, which contradicted information provided by HPSC on its April 13, 2001 renewal application. Specifically, HPSC had answered "no" to Question 12 of the application, "Do the employees who reconcile the monthly bank statements also either: a. sign checks? b. handle deposits? or c. have access to check signing machines or signature plates?" MacKay related her findings up the ladder to her superiors at Federal, who proceeded on the same assumptions as MacKay. MacKay also engaged outside coverage counsel, who reviewed HPSC's file and issued an opinion letter.

Meanwhile, HPSC remained in contact with Federal regarding the status of its claim. Finally, on September 13, 2002, HPSC issued an ultimatum to Federal: If Federal did not pay the claim, HPSC would file suit by September 20, 2002.

## II.  Relevant Proceedings

Without further investigation, Federal responded to HPSC's ultimatum by filing a diversity suit seeking rescission of the policy for fraud and misrepresentation.  HPSC counterclaimed for recovery under the policy and for damages under Mass. Gen. Laws ch. 93A for unfair and deceptive trade practices based on Federal's delay in investigating and paying the claim.

Two weeks after the initial case management conference, HPSC informed Federal that MacKay had misread the PwC report.[1]  In fact, it was not Morrison, but his subordinate, Sylvia Maguire, who reconciled the bank statements on ACFC's fifteen operating accounts.  Maguire did not sign checks or handle deposits, and ACFC had no check signing machine or signature plate.  All transactions on these fifteen accounts were accomplished through wire transfers. The only account for which Morrison both reconciled statements and signed checks was an imprest petty cash account, which was capped at $10,000 and could only be replenished each month after HPSC reviewed ACFC's disbursements.

Federal then shifted its theory of the case, relying on Morrison's authority over all sixteen of the ACFC accounts. Federal also contended that Morrison's authority over wire

---

[1]  The conversation between the parties' attorneys was memorialized in a letter dated February 6, 2003.

transfers was the equivalent of signing checks for the purposes of Question 12 on the renewal application.

Both sides filed cross motions for summary judgment. The district court denied both motions, concluding that HPSC's response to Question 12 was truthful as to the fifteen operating accounts, given that the question did not ask about an employee's unexercised authority or about wire transfer authority. The district court found that the only misrepresentation made by HPSC involved Morrison's control over the petty cash account,[2] but that given the relatively small size of that account compared to the fifteen operating accounts, the materiality of the misrepresentation was a question of fact for the jury. The district judge noted, however, that if he "were the factfinder, [he] would most likely agree that the misrepresentation . . . [was] a material one."

Prior to trial, Federal moved in limine to exclude any evidence regarding Federal's past underwriting practices on the basis that such evidence was irrelevant to the materiality of HPSC's misrepresentation. The district court denied the motions.

At trial, Federal's underwriter, Yalonda Mason, testified that had she known the truth about Morrison's unsegregated duties, she still would have written the policy, but with a larger deductible or higher premium because of the increased risk.

---

[2] Outside auditors had alerted HPSC to Morrison's unsegregated duties on March 27, 2001 -- more than two weeks before HPSC filed the renewal application.

Federal also called a risk management expert, Dean P. Felton, who testified that the lack of segregation between reconciliation and check-writing duties increased the risk of loss from theft. Felton further indicated that if HPSC's answer to Question 12 had been truthful, he would have either increased the deductible, increased the premium, or excluded the checking account from coverage.

HPSC's expert, Michael Bracken, testified that in his opinion the imprest petty cash account "did not present a materially elevated risk of loss to HPSC or [Federal]." Bracken also concluded that had HPSC answered "yes" to Question 12, it would have made no difference in Federal's decision to underwrite HPSC's policy. He explained that he had reviewed HPSC's past applications to Federal, and that Federal had not followed up on any of HPSC's past "no" answers or even questioned its "yes" answer to Question 12 in 1995. Bracken claimed that this question was important and that, as an underwriter, he would have investigated an affirmative answer.

At the conclusion of the evidence, Federal moved for a directed verdict under Rule 50(a), but the district court denied the motion. The district court instructed the jury that Federal was not obligated to pay HPSC's claim if HPSC's misrepresentation was material, meaning that if Federal had known the truth, it would have declined to issue the policy or charged a higher rate or

premium in light of the increased risk.  The jury found in favor of HPSC, concluding that its misrepresentation was not material.

The district court then held a bench trial on the chapter 93A claim.  At the close of HPSC's case, Federal filed a motion for judgment as a matter of law, which the district court denied. After Federal presented its case, the court found that Federal's initial determination regarding HPSC's misrepresentation was made in good faith, but that Federal had violated two statutory duties under Mass. Gen. Laws ch. 176D, § 3(9):  Federal's decision to seek rescission without inquiring into the facts or giving HPSC a chance to respond breached its duty under subsection (d) to conduct a reasonable investigation before rejecting a claim, and its failure to make a reasonable settlement offer upon learning of its mistaken conclusion regarding Morrison's reconciliation and check-writing duties on the fifteen operating accounts violated its duty under subsection (f) to "effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."  The court concluded that the two statutory violations constituted unfair business practices within the meaning of chapter 93A, and that Federal's conduct after learning of its flawed assumptions was a breach of its duty of good faith, which merited doubling the damages incurred thereafter.

### III.  Discussion

On appeal, Federal argues that it is entitled to judgment as a matter of law on the rescission claim because HPSC's misrepresentation objectively increased the risk of loss, or alternatively to a new trial because the district court admitted irrelevant and prejudicial evidence on the materiality issue. Federal also contends that it is entitled to judgment as a matter of law on the unfair trade practices claim because it had a reasonable, plausible basis for denying HPSC's claim, even after it learned of its original mistaken conclusion.

### A.  Preservation of the Issues

As a preliminary matter, HPSC asserts that Federal failed to preserve any issues on appeal because it did not renew its Rule 50(a) motion and it did not make any evidentiary objections at trial.

### 1. Judgment as a Matter of Law

It is now settled that an appellate court "cannot review the denial of a Rule 50(a) motion based on the sufficiency of the evidence when the party appealing the verdict failed to renew its sufficiency challenge in the district court pursuant to Rule 50(b)." Vázquez-Valentín v. Santiago-Díaz, 459 F.3d 144, 148 (1st Cir. 2006) (citing Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 126 S. Ct. 980, 987 (2006)).  Despite our previous case law establishing a strict "dearth of evidentiary support" standard of

-8-

review when a party failed to comply with the strictures of Rule 50, see, e.g., Surprenant v. Rivas, 424 F.3d 5, 13 (1st Cir. 2005), the Supreme Court made it abundantly clear in Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc., that in the absence of a renewed motion for judgment as a matter of law pursuant to Rule 50(b), we are utterly "without power to direct the District Court to enter judgment contrary to the one it had permitted to stand," 126 S. Ct. at 985 (quoting Cone v. W. Va. Pulp & Paper Co., 330 U.S. 212, 218 (1947)).

Federal failed to renew its Rule 50(a) motion after the jury's verdict, and accordingly we have no power to review the district court's denial of judgment as a matter of law on the rescission claim.

The strictures of Rule 50, however, do not apply in non-jury trials. Fed. R. Civ. P. 50 (specifying the requirements for judgment as a matter of law in jury trials); see also Colonial Penn Ins. v. Market Planners Ins. Agency Inc., 157 F.3d 1032, 1037 n.3 (5th Cir. 1998) ("In a jury trial, of course, a party must make (and renew at the trial's conclusion) a Rule 50(a) motion for judgment as a matter of law in order to preserve sufficiency of the evidence for appellate review. But nothing indicates that a similar rule applies to an appeal of the sufficiency of evidence to support findings or sufficiency of findings to support a judgment following a bench trial." (citations omitted)). Rather, we treat

motions for judgment as a matter of law made during bench trials as motions for judgment on partial findings under Rule 52(c). <u>See</u> <u>Ne. Drilling, Inc.</u> v. <u>Inner Space Servs., Inc.</u>, 243 F.3d 25, 37 (1st Cir. 2001); <u>see also</u> <u>Mullin</u> v. <u>Town of Fairhaven</u>, 284 F.3d 31, 36 (1st Cir. 2002). Federal made such a motion at the close of HPSC's case, but then proceeded to put on evidence, thus waiving its right to appeal the denial of that motion. <u>Ne. Drilling, Inc.</u>, 243 F.3d at 37. "Consequently, we treat the arguments [Federal] makes on appeal under the heading of 'motion for judgment as a matter of law' simply as challenges to the factual and legal sufficiency of the district court's determinations based on all the evidence," <u>id.</u> (emphasis omitted), challenges which Federal may raise for the first time on appeal, <u>Colonial Penn Ins.</u>, 157 F.3d at 1036 ("We see no reason why [a party], following a bench trial, cannot argue now for the first time [on appeal] that the court's findings were clearly erroneous or that they cannot support the judgment." (footnote omitted)).

## 2. Improper Admission of Evidence

HPSC also argues that Federal did not preserve its right to seek a new trial on the basis of improperly admitted evidence because it did not object to the introduction of the evidence at trial nor file a motion for a new trial under Rule 59(b).

While Federal did not object to the introduction of any evidence at trial, it did file motions <u>in limine</u> before trial

seeking to bar evidence concerning its past underwriting practices. Motions in limine preserve evidentiary issues for appeal if the district court made a final and unconditional ruling on the motion; no further steps, such as filing a Rule 59(b) motion,[3] are necessary. Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003).

Of course, to preserve the issue, the motion in limine must raise the same evidentiary error raised on appeal. HPSC alternatively argues that Federal's pre-trial motion objected to the introduction of evidence regarding prior applications and policies on the ground that such evidence was irrelevant to the narrow issue at trial, "that is, whether the misrepresentation on the 2001 policy application regarding the petty cash account was material," whereas on appeal Federal argues that the evidence was irrelevant because it went to the underwriter's subjective state of mind. We fail to see the difference in Federal's arguments as framed by HPSC, given that Federal's position on appeal is that the materiality inquiry is an objective one, rather than a subjective

---

[3]  While it is true that the failure to move for a new trial precludes our review of sufficiency of the evidence and inconsistent verdict claims, see Unitherm Food Sys., 126 S. Ct. at 986; Torres-Arroyo v. Rullán, 436 F.3d 1, 7 (1st Cir. 2006), it does not affect our review of a district court's decision to admit or exclude evidence over a party's properly preserved objection, see Torres-Arroyo, 436 F.3d at 7 (deciding the challenged evidentiary issue despite the appellant's failure to file a motion for a new trial). Rather, if we determine that the district court erred in admitting evidence, the appropriate remedy would be a new trial. See Sec'y of Labor v. DeSisto, 929 F.2d 789, 796 (1st Cir. 1991). Thus, HPSC's theory that failure to file a motion for a new trial precludes our review of an evidentiary ruling is flawed.

one, hence that the underwriter's subjective state of mind is irrelevant to the issue of materiality.

## B. Evidentiary Issue

Having determined that Federal preserved the evidentiary issue, we turn to the substance of that issue. We review a district court's ruling on the admission of evidence for abuse of discretion. Pelletier v. Main Street Textiles, LP, 470 F.3d 48, 52 (1st Cir. 2006).

Federal objects to the district court's admission of evidence concerning Federal's past underwriting of HPSC's policies on the ground that such evidence permits a subjective inquiry into what the underwriter would have done had she known the truth, which is irrelevant to the objective standard of whether the misrepresentation increased the insurer's risk of loss. We disagree with Federal's premise.[4]

Federal's right to rescind HPSC's policy is governed by Mass. Gen. Laws ch. 175, § 186, which provides:

> No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless

---

[4] Federal's fundamental argument on appeal is that the district court applied the wrong standard in the case. However, Federal did not object to the trial court's instructions to the jury, nor did it preserve its right to appeal the court's denial of judgment as a matter of law. Our only inquiry, therefore, is whether the evidence in question is relevant to the objective materiality of HPSC's misrepresentation.

-12-

> such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

With respect to the materiality of a misrepresentation in an insurance application, "[a] material fact, measured by an objective standard, is one which would 'naturally influence the judgment of [an] underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium.'" A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund, 838 N.E.2d 1237, 1246 (Mass. 2005) (second alteration in original) (quoting Employers' Liab. Assur. Corp. v. Vella, 321 N.E.2d 910, 913 (1975)).

Thus, the materiality of a misrepresentation depends on what a reasonable underwriter would have done differently had she known the truth behind the misrepresentation. See Boston Mut. Ins. Co. v. N.Y. Islanders Hockey Club, L.P., 165 F.3d 93, 97 (1st Cir. 1999). There are, as a matter of common sense, a variety of ways to objectively prove what an underwriter would do in a given situation. The parties could offer the testimony of various underwriters or other risk management experts as to what they would have done in the same situation, as both sides did in this case. See Hanover Ins. Co. v. Leeds, 674 N.E.2d 1091, 1095-96 (Mass. App. Ct. 1997) (basing a finding of materiality on the testimony of the insurer's underwriter). Or the parties could provide evidence of what underwriters have in fact done in the past in similar

situations.  Similarly, it makes sense that an insurer might wish to establish what it would do in a particular situation by presenting evidence of its own policies and past practices.  See Boston Mut. Ins. Co., 165 F.3d at 97 ("[T]he statute does not go so far as to require proof by the insurer that it would have acted differently (although such proof certainly tends to establish materiality . . . ).") (citing Barnstable County Ins. Co. v. Gale, 680 N.E.2d 42 (Mass. 1997)); TIG Ins. Co. v. Blacker, 767 N.E.2d 598, 602 (Mass. App. Ct. 2002) (basing a finding of materiality on evidence of the insurer's own standards).

If Federal could present evidence of its own past underwriting practices to establish materiality, it follows that HPSC could do the same to establish immateriality.  Thus, it is clear that the district court did not err in admitting evidence of Federal's actions on past applications, including HPSC's, since such evidence provides relevant insight into how specific information would influence a reasonable underwriter's decisions regarding a particular policy.

### C.  Chapter 93A claim

Federal also argues that it is entitled to judgment as a matter of law on HPSC's unfair and deceptive trade practices claim. As explained above, we treat this argument as a challenge to the factual and legal sufficiency of the district court's conclusions. Following a bench trial on a chapter 93A claim, we review the

-14-

district court's legal conclusions <u>de novo</u> and its underlying factual findings for clear error. <u>Commercial Union Ins. Co.</u> v. <u>Seven Provinces Ins. Co.</u>, 217 F.3d 33, 40 (1st Cir. 2000). We also review the district court's "evaluative judgment[s], [when] applying a legal standard to a particular set of facts," for clear error. <u>Roland M.</u> v. <u>Concord Sch. Comm.</u>, 910 F.2d 983, 990 (1st Cir. 1990). The determination of whether certain conduct is unfair or deceptive is a question of fact, but whether that conduct rises to the level of a chapter 93A violation is a question of law. <u>Commercial Union Ins. Co.</u>, 217 F.3d at 40.

The district court concluded that Federal violated its statutory duties to undertake a reasonable investigation of the facts before denying the claim and to make a settlement offer when liability has become reasonably clear, Mass. Gen. Laws ch. 176D, § 3(9),[5] and that the violation of these duties constituted an

---

[5] Mass. Gen. Laws ch. 176D, § 3(9) states in relevant part:

The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:--
. . .
(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:
. . .
(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
. . .
(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear . . . .

-15-

unfair trade practice under Mass. Gen. Laws ch. 93A, § 2(a) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."). The district court also found that Federal's conduct was knowing or willful after February 6, 2003, when it learned that the fundamental premise of its suit was flawed; the court accordingly doubled the damages incurred by HPSC after that date. Id. § 11 ("If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two.") Federal argues that the district court's rulings are not supported by the record. We disagree.

### 1. Unfair Trade Practices Determination

The Massachusetts Supreme Judicial Court has concluded that a violation of General Laws chapter 176D, § 3, which defines unfair claim settlement practices in the insurance industry, is evidence of an unfair business practice under chapter 93A, § 2, which would give rise to a cause of action under chapter 93A, § 11.[6] See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912,

---

[6] There may be additional requirements for liability to attach, such as the requirement that a claimant suffer a loss of money or property, Mass. Gen. Laws ch. 93A, § 11, and that the unfair or deceptive conduct "occurred primarily and substantially within the commonwealth," id.; Kuwaiti Danish Computer Co. v. Digital Equip.

-16-

917 (Mass. 1993); see also Peterborough Oil Co. v. Great Am. Ins. Co., 397 F. Supp. 2d 230, 244 (D. Mass. 2005) ("Unlike in the context of consumer plaintiffs under § 9, a violation of chapter 176D is only evidence of a violation of chapter 93A, § 11."). The question for us then is whether the district court correctly concluded that Federal breached its statutory duties to investigate and to effectuate settlement.

With respect to the duty to investigate, the record supports the district court's determination that Federal did not conduct a reasonable investigation before filing its suit for rescission. Specifically, the district court found that MacKay never confirmed her tentative conclusion regarding Morrison's authority over the accounts in question, and no one at Federal ever attempted to contact HPSC to obtain more information regarding the apparent discrepancy between HPSC's answer to Question 12 on the renewal application and the conclusions in the PwC report.[7] Thus, other than reviewing the materials submitted with HPSC's claim, it appears that Federal did no investigation of the available facts before denying coverage. Consequently, the district court

---

Corp., 781 N.E.2d 787, 799-800 (Mass. 2003), but none of those requirements are at issue here.

[7] Federal also challenges the district court's factual findings underlying these conclusions. There is ample support in the record, however, to support the judge's conclusion that MacKay misread the PwC report and that her mistaken perception was shared by her superiors.

correctly concluded that Federal's failure to investigate breached its statutory duty under chapter 176D, § 3(9)(d).

The record also supports the district court's finding that Federal breached its statutory duty to effectuate settlement. An insurer's duty to make a settlement offer arises when "liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). The determination as to when liability is reasonably clear depends on when "a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." Nyer v. Winterthur Int'l, 290 F.3d 456, 461 (1st Cir. 2002) (quoting Demeo v. State Farm Mut. Auto. Ins. Co., 649 N.E.2d 803, 804 (Mass. App. Ct. 1995)). Here, the district court considered liability sufficiently clear after Federal learned that Morrison did not have reconciliation and check-writing duties with respect to ACFC's fifteen operating accounts. Instead of admitting its error and making a settlement offer, however, Federal changed its legal theory, and when that one failed, Federal again shifted its position, finally settling on the theory that HPSC's misrepresentation regarding the petty cash account was material enough to warrant denying the claim. While we have some doubt that a reasonable person would "probably" have concluded that Federal was liable on HPSC's claim, we are not prepared to say that the court's conclusion was clearly erroneous.

Federal contends that it had a plausible basis for denying coverage at all times, even after it learned that HPSC's only misrepresentation involved the petty cash account, and that an insurer who has a good faith, plausible basis for denying a claim "cannot ordinarily be said to have committed a violation of [chapter] 93A." Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 645 N.E.2d 1165, 1169 (Mass. 1995). Even if we were inclined to agree that Federal's basis for denying coverage was plausible, in that it was a "[s]eemly or apparently valid" legal theory, Webster's II New Riverside University Dictionary 901 (1988), the district court explicitly determined, with sufficient support in the record, as explained below, that Federal was not acting in good faith after February 6, 2003. The absence of good faith supports the district court's unfair settlement practice determination, even in the face of a plausible coverage position. See Guity v. Commerce Ins. Co., 631 N.E.2d 75, 77-78 (Mass. App. Ct. 1994) ("A plausible, reasoned legal position that may ultimately turn out to be mistaken . . . is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D. An absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A-176D action based on unfair settlement practice." (citations omitted)).

In sum, the district court did not clearly err in finding that Federal failed to conduct a reasonable investigation before

-19-

seeking rescission and then failed to make a settlement offer once liability was reasonably clear, and thus that Federal breached its statutory duties. Therefore, we affirm the district court's legal conclusion that Federal violated chapter 93A by engaging in unfair claim settlement practices as defined in chapter 176D, § 3(9). See Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 157 (1st Cir. 2000) ("We are persuaded here . . . that the court's finding that [the plaintiff] satisfied the imperatives of chapter 176D was amply supported by competent and credible evidence. So, too, were the court's fairness determinations under chapter 93A. We need go no further.")

## 2. Willfulness Determination

Finally, the district court's conclusion that "Federal's conduct . . ., while not motivated by a dishonest purpose, spite, or ill will, was after February 6, 2003, a knowing or willful breach of its duty of good faith" is also supported by the record.[8] The district court was convinced based on the evidence before it that Federal acted in bad faith by, among other things, racing to litigate without knowing all the facts and then stubbornly refusing to admit its error. Cf. id. ("The district court, which saw and heard the witnesses, concluded that Continental had not sailed too

---

[8] February 6, 2003, was the date of the letter memorializing HPSC's revelation that MacKay had misread the PwC report and that Federal's assumption that Morrison had reconciled statements and wrote checks on all sixteen ACFC accounts was flawed.

-20-

close to the chapter 176D winds . . . ."); <u>Correa</u> v. <u>Hosp. S.F.</u>, 69 F.3d 1184, 1194 (1st Cir. 1995) ("To be sure, the evidence in this case is not particularly precise.  But facts at trial, as in life, do not always appear in black and white.  Juries and judges frequently must distinguish between manifold shades of gray.").  Accordingly, the district court properly doubled the damages incurred after February 6, 2003.  <u>Canal Elec. Co.</u> v. <u>Westinghouse Elec. Corp.</u>, 548 N.E.2d 182, 188 n.10 (Mass. 1990) ("In circumstances of knowing and wilful violation of c. 93A or of bad-faith refusal to settle, a plaintiff also may be entitled to double or treble damages under c. 93A itself.")

### 3. Attorneys' Fees

HPSC asks that we order Federal to pay attorneys' fees incurred by HPSC in defending this appeal.  HPSC is indeed entitled to "reasonable attorney's fees for [its] successful defense of [its] award of attorney's fees and costs under [chapter] 93A." <u>Twin Fires Inv., LLC</u> v. <u>Morgan Stanley Dean Witter & Co.</u>, 837 N.E.2d 1121, 1140 (Mass. 2005).  Federal did not challenge the district court's calculation of attorneys' fees and costs below, and therefore we will not disturb that ruling.  With regard to the calculation on appeal, however, we award only those attorneys' fees incurred in defending the chapter 93A claim.  <u>See</u> <u>Incase, Inc.</u> v. <u>Timex Corp.</u>, 421 F. Supp. 2d 226, 244 (D. Mass. 2006) ("[When t]he chapter 93A claim was brought together with a number of other

claims[,] . . . an award of fees and costs under chapter 93A should generally include an amount only for those fees and costs that were incurred in connection with the chapter 93A portion of the case.") The factual basis of the chapter 93A claim is sufficiently distinct from that of the breach of contract claim that HPSC and its attorneys should be able to differentiate the time spent on each of the two claims.  See id.  However, to the extent that the attorneys' fees incurred in successfully defending the chapter 93A claim cannot be excised with any certainty from those related to HPSC's breach of contract defense, HPSC is entitled to the fees common to both claims, since the two are based on the same core of facts.  Id. (citing Twin Fires Inv., 837 N.E.2d at 1140).

## IV.  Conclusion

For the reasons stated above, we affirm the judgment in favor of HPSC on both the rescission and the unfair trade practices claims, as well as the doubling of damages after February 6, 2003.

**Affirmed**.